1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ALABAMA
2                           NORTHEASTERN DIVISION

3

4        JOHN PRINCE,                    *
                    Plaintiff,           *   5:20-cv-208-LCB
5                                         *   February 24, 2020
         vs.                             *   Huntsville, Alabama
6                                         *   10:00 a.m.
         HUI HULIAU, et al.,             *
7                    Defendant.          *
         ***************************

8

9                         TRANSCRIPT OF MOTION HEARING
                   BEFORE THE HONORABLE LILES C. BURKE
10                      UNITED STATES DISTRICT JUDGE

11

         FOR THE PLAINTIFF:
12       W. Brad English, Esq.
         Benjamin L. McArthur, Esq.
13       MAYNARD, COOPER & GALE, PC
         655 Gallatin Street
14       Huntsville, Alabama 35801

15

         FOR THE DEFENDANT:
16       C. Gregory Burgess, Esq.
         Lauren Audrey Smith, Esq.
17       LANIER FORD SHAVER & PAYNE, PC
         PO Box 2087
18       Huntsville, Alabama 35804
         (256) 535-1100
19

         Brian K. Parker, Esq.
20       Eric A. Frick, Esq.
         PARKER POE ADAMS & BERNSTEIN LLP
21       Three Wells Fargo Center
         Charlotte, NC 28202
22       (704) 335-9847

23

         COURTROOM DEPUTY:  Stephanie P. Tolen
24

25

                    CHRISTINA K. DECKER, RMR, CRR
                   Federal Official Court Reporter
                        101 Holmes Avenue, NE
                        Huntsville, AL 35801
                 256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          COURT REPORTER:  Christina K. Decker, RMR, CRR

2      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
3   Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
                    computerized stenotype.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2      JOHN PRINCE                                      5
       DIRECT EXAMINATION                               5
3      BY MR. ENGLISH
       CROSS-EXAMINATION                                47
4      BY MR. PARKER
       REDIRECT EXAMINATION                             68
5      BY MR. ENGLISH
       RECROSS-EXAMINATION                              72
6      BY MR. PARKER
       FURTHER REDIRECT EXAMINATION                     72
7      BY MR. ENGLISH

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE COURT:  Good morning.
 4         All right.  Plaintiffs, how long do we need this morning
 5    for your side of the case?
 6              MR. ENGLISH:  Your Honor, my expectation is we've got
 7    two witnesses.  Probably 20, 30 minutes apiece on the long end.
 8              THE COURT:  20 minutes -- 20 or 30 minutes for each
 9    side?
10              MR. ENGLISH:  Well, I mean, ours is probably going to
11    take 15 to 30 minutes each witness.  And then I'm sure they
12    will have some cross.  That would be my best estimate.
13              THE COURT:  All right.  Well, that sounds good to me.
14    Call your first witness.
15              MR. ENGLISH:  All right.
16              THE COURT:  While he's coming around, let me get all
17    the attorneys just to identify themselves for the record and
18    who they represent.
19              MR. ENGLISH:  Your Honor, good morning.  I'm Brad
20    English.  With me is my partner Ben McArthur.  And we represent
21    the plaintiffs.
22              MS. SMITH:  Your Honor, Lauren Smith, representing the
23    defendants.  And this is Brian Parker and Eric Frick from North
24    Carolina.  They're appearing PHV.  And then Greg Burgess.
25              MR. BURGESS:  Good morning, Judge.
```

1          THE COURT:  Good morning.

2                          JOHN PRINCE,

3  having been first duly sworn by the courtroom deputy clerk, was

4  examined and testified as follows:

5          MR. ENGLISH:  Your Honor, in the interest of trying to

6  be efficient, we made books of the exhibits prelabled.

7          THE COURT:  Super.

8          MR. ENGLISH:  Is it all right if I leave one at the

9  witness table?

10         THE COURT:  Absolutely.

11         MR. ENGLISH:  And I have one for Your Honor.

12         THE COURT:  Super.  That would be great.

13         THE COURTROOM DEPUTY CLERK:  Could you state your name

14  for the record, please?

15         THE WITNESS:  John Prince.

16         THE COURTROOM DEPUTY CLERK:  Thank you.

17                      DIRECT EXAMINATION

18  BY MR. ENGLISH:

19  Q    Mr. Prince, good morning.

20  A    Good morning.

21  Q    If you would, just introduce yourself a little briefly to

22  the Court and to everyone here.

23  A    My name is John Prince.  I'm the founder of Kaya

24  Associates, and the former president and CEO.

25  Q    When did you found Kaya?

1  A    It was founded in 2003.  We began early operations in

2  2004.

3  Q    Who were the shareholders?

4  A    Myself and another gentleman named Robert Dunn.

5  Q    Did you come up with the name Kaya?

6  A    I did.

7  Q    Can you tell us where you came up with that name?

8  A    Kaya is named after the province that my grandfather grew

9  up in, in Korea.  I was very close to my grandfather.

10 Q    Who were the -- I may have asked you this.  Forgive me if

11 I did.  Who were the shareholders of Kaya?

12 A    I owned 90 percent of Kaya.  Robert Dunn owned 10 percent

13 at the time when it was founded.

14 Q    Was there ever a time you became the sole shareholder of

15 Kaya?

16 A    Yes.  About 2014 I became the sole shareholder.

17 Q    Tell the Court, if you would, just generally what type of

18 business Kaya is in, or was in at least until -- while you were

19 involved.

20 A    Sure.  Kaya was originally an environmental firm.  We did

21 environmental assessments, environmental impact statements.

22     Our primary customer was the Space and Missile Defense

23 Command at Redstone.  And as their mission grew -- they being

24 our single largest customer at that time.  As their mission

25 grew, ours grew, as well.  And we sort of grew as a need to

1  fill a need for our customer.

2      So starting with environmental, we then added facilities

3  engineering.  We added air traffic control.  And we added base

4  operations.  Basically an installation management function.

5      So at its peak, we had five disciplines.  Information

6  technology was another.

7  Q    Just looking through some of the documents, I have seen a

8  term 8(a).

9  A    Yes.

10 Q    Does that mean anything to you?

11 A    Yes.

12 Q    Can you tell us what that is?

13 A    8(a) is a section of the Small Business Act that allows

14 preferred contracting privileges to a certain group of

15 socioeconomic companies, disadvantaged companies.

16 Q    Was Kaya a participant in the SBA(8) program?

17 A    Yes, it was.

18 Q    For how long?

19 A    Nine years.  Nine years is the duration of the program.

20 Q    What happened when Kaya graduated from the 8(a) program?

21 A    Well, it's -- the 8(a) program offers fantastic benefits

22 for disadvantaged companies to start business.  It provides you

23 with some preferred contracting benefits.

24      There's also a downside with the program.  The downside is

25 if your project, your contract, your program, whatever it might

1  be, once it's brought into the 8(a) program, it's nearly

2  impossible to get it out.  In other words, if you had the -- if

3  you had the program as an 8(a), once you graduate from the 8(a)

4  program, it's nearly impossible to bring the program with you.

5       So ultimately 8(a) companies are faced with either finding

6  partners that are 8(a) companies so you can at least have a

7  portion of that contract or program moving forward.  Or in a

8  lot of cases, you tend -- if you're fairly diverse, like we

9  were with five disciplines, what you're really forced to do is

10 make some hard choices.

11      A lot of cases you end up winnowing down your areas of

12 business to one or maybe two disciplines, and essentially

13 jettison the rest -- the smaller, the less performing

14 organizations -- because it's the only way you can survive.

15 Q    Let me ask you a couple of questions about some of the

16 terms you used.

17      You said SBA program.  And then you also referred to

18 "bring the program with you."  At least as regards to your

19 comment about "bring the program with you," did you mean

20 contracts work?  What did that mean?

21 A    It's exactly right.  It was contracts, the work.  What I

22 referred to as the program is your company -- your customer's

23 mission.

24 Q    So it was difficult to bring the contracts and work you

25 had under the 8(a) program out of the 8(a) program, or once

1  Kaya graduated from the 8(a) program?

2  A    Yes.  It's nearly impossible.

3       So we were faced with either terminating certain divisions

4  in the company and focusing on one or two, or finding some

5  other method.  And what we chose to do was -- these were

6  longstanding employees.  They were -- most of them started with

7  me from the very beginning of the company.

8       So what we chose to do was do both of those things.  I

9  took the environmental, the facilities engineering, and the IT

10 work, and spun it off to a small company, to a separate

11 company.  Because, in essence, those disciplines were

12 considered large because of the growth of Kaya's other

13 disciplines.

14      And then the other thing we did is we focused Kaya on

15 installation management and air traffic control work.

16 Q    The other company you mentioned that you spun these

17 divisions off to, what was the name of it?

18 A    That's KFS.

19 Q    Okay.  Was it an 8(a)?

20 A    8(a), correct.

21 Q    Did that provide any particular benefit to Kaya?

22 A    Absolutely.  Again, the projects, the contracts that were

23 in the 8(a) program were going to stay in the 8(a) program.

24      So by taking those disciplines and spinning them off into

25 a separate -- into another 8(a) company with an 8(a) partner,

 1  they basically breathed new life into those organizations.

 2  Q    How --

 3        THE COURT:  I've got a quick question.  Why is it so

 4  hard to bring a company out of 8(a)?

 5        THE WITNESS:  Well, the contracts that you were

 6  working on as an 8(a), when the 8(a) program ends -- and those

 7  contracts are typically five years in duration.  When it comes

 8  up for rebid and you're not an 8(a), you can't bid on that

 9  anymore.  So you're no longer eligible for that contract unless

10  you team up with a prime partner that is an 8(a) and you serve

11  as a subcontractor.

12        THE COURT:  Go ahead.  Judge Wilkes always said,

13  Judge, if you're going to try my case for me, don't lose it.

14  So I won't do too much of that.  Go ahead.

15  BY MR. ENGLISH:

16  Q    Mr. Prince, just to kind of pick up on the question that

17  the Court asked, tell us how, if at all, Kaya planned to work

18  with KFS to deal with the 8(a) program that you have described.

19  A    Well, it was hoped that there would be many teaming

20  opportunities going forward between the two firms.  And the

21  disciplines were separate, but what we were trying to do was

22  play within the rules of the SBA 8(a) program and still

23  maintain the employees that we had and maintain the business

24  that we were in.

25  Q    So was it the plan that KFS could be the prime contractor

1  on 8(a) contracts --

2  A     Yes.

3  Q     -- and Kaya could be a subcontractor?

4  A     Correct.  Correct.

5  Q     Did you own any interest in KFS?

6  A     I have a minority interest in KFS, yes.

7  Q     At some point in time, did you sell your interest in Kaya?

8  A     I did.

9  Q     All right.  Take a look, if you would, at Tab 1,

10  Exhibit 1, in the book that's in front of you.

11  A     Yes.

12  Q     Can you identify the documents that are at Tab 1 for us,

13  please?

14  A     It's a purchase agreement between the Kaya and Briefne

15  Group.

16  Q     And as you flip through this, there's a number of

17  documents or -- do you see your signature on these documents

18  that --

19  A     Yes, I do.

20  Q     What's the date of these documents?  It's on the first

21  page, I believe.

22  A     April 29th, 2016.

23  Q     And are these documents the documents that effectuated

24  your sale -- the sale of your stock in Kaya?

25  A     Correct.  Yes, sir.

1          MR. ENGLISH:  Your Honor, we would offer Exhibit 1.

2          THE COURT:  Any objection?  Be admitted.

3    BY MR. ENGLISH:

4    Q    Tell the Court, if you would, why it came to be that you

5    sold your stock in Kaya.

6    A    Well, as I mentioned earlier, you know, the strategy was a

7    good one, but it failed in its execution.

8          Kaya, its most significant contract that represented 40

9    percent of its -- 35 to 45 percent of its revenues was the base

10   operations contract in Fort Greely, Alaska.

11         And per our plan, we teamed up with an 8(a) partner with

12   an Alaska Native Corporation, and pursued that recompete of our

13   existing contract.  Unfortunately, it failed.

14         Once that failed, we were -- you know, obviously, taking a

15   35 to 40 percent hit is rough.  But during that period, the

16   other thing that occurred, if I'm remembering the timeline

17   correctly, what we created with KFS and Kaya was absolutely

18   within the rules of the 8(a) program.

19         When we created -- when we employed this strategy, we

20   actually talked with SBA and the headquarters of the SBA in

21   Washington, D.C., and we cleared everything with them before we

22   proceeded.  But the problem we were running into is that there

23   was an appearance -- to the local SBA offices, there was an

24   appearance of conflict of some sort because the rules state

25   that you can't have a significant ownership in two 8(a)

1  companies in the same business line.  And -- but we had, like I

2  said, we had cleared this through headquarters, and we had

3  crafted our strategy based on the advice we got from the

4  headquarters.  But the local offices kept stumbling over this.

5       And it was a difficult thing.  It became a real obstacle.

6  And it actually cost us our third largest contract at NASA just

7  because of the delays in processing because of this

8  questionable.  From the local SBA office's perspective, there

9  were a lot of questions that they had to ask.  So...

10 Q    What goal or effect were you hoping the sale of your stock

11 would have -- stock in Kaya have on the competition that you

12 were engaged in with KFS?

13 A    Well, that's -- again, I wanted to avoid any appearance of

14 conflict.  And by taking myself out of the equation, it cleared

15 the decks for them to team up on many opportunities.

16 Q    So after the effectuation of the transaction reflected by

17 the documents in Exhibit 1, were you any longer a shareholder

18 of Kaya?

19 A    No, I was not.

20 Q    But you continued to own KFS?

21 A    Correct.

22 Q    You mentioned a couple of terms that are going to be

23 important in a second.  I just want to get you to clear them

24 up.

25 A    Sure.

1   Q     You said Alaska Native Corporation?

2   A     Yes.

3   Q     Why is that significant, if at all?

4   A     Alaska Native Corporation and their counterparts in the

5   Native Hawaiian Organizations, they are afforded some special

6   privileges within the 8(a) program.

7         One of the privileges is that, whereas Kaya and most --

8   and every other standard 8(a) company is limited to the

9   nine-year program.  The exceptions made for ANCs -- Alaska

10  Native Corporations and Native Hawaiian Organizations -- is

11  that they are allowed to establish multiple 8(a) companies

12  within their umbrella, within their corporate structure.

13        So when one 8(a) expires after the nine-year period,

14  there's another 8(a) that could be stood up in its place right

15  behind it.  So, therefore, they gain an advantage that we don't

16  have.  We're limited to the nine-year cycle.

17  Q     Was KFS a Native Hawaiian Corporation or Alaska Native

18  Corporation?

19  A     It's a Native Hawaiian Corporation.

20  Q     So does it have that perpetual 8(a) status, as you

21  understand it?

22  A     Yes, it does.  Yes.

23  Q     The purchaser in the -- let me ask you this:  After you

24  sold your stock in Kaya, who became the shareholder?

25  A     Briefne.

1  Q     Can you spell that for us?

2  A     B-R-I-E-F-N-E, I believe is the correct spelling.

3  Q     And tell us what Briefne was.

4  A     Briefne was a company owned by a friend and an associate

5  that I -- that I sold Kaya to.

6  Q     What was his name?

7  A     Dan McCauley (phonetic).

8  Q     If you would, as part of Exhibit 1, you will see at the

9  bottom there's little Bates label numbers.  Turn several pages,

10 if you would, to the pages that are Bates labeled 16298 through

11 16303.  It's at Tab 5, or it's Exhibit 5 to the purchase

12 agreement.

13 A     Yes.

14 Q     Can you tell us what that document is?

15 A     That's a promissory note from Kaya Associates to me in the

16 amount of $6,389,201.25.

17 Q     Was that the purchase price of your stock in Kaya?

18 A     Yes.

19 Q     All right.  Now, at some point in time, was the ownership

20 of Kaya sold from Briefne to another company?

21 A     Yes.

22 Q     All right.  Were you involved in that transaction?

23 A     I was involved as a note holder, yes.

24 Q     As a note holder, did you participate in the negotiation

25 of the terms of the transaction?

```
 1   A     Yes.

 2   Q     If you know, what motivated that subsequent change of

 3   ownership?

 4   A     Well, further deterioration in Kaya's position.  It was

 5   evident that, you know, things were not going to change moving

 6   forward, were not going to improve moving forward at that time.

 7   We continued to lose contracts, revenues continued to drop.  So

 8   it was time to find another alternative for Kaya.

 9   Q     If you would, lean in a little bit, or pull that closer to

10   you, because with the air on, I'm having a hard time hearing

11   you.

12         Who was the subsequent purchaser of Kaya's stock?

13   A     Hui Huliau.

14   Q     Will you spell that, please?

15   A     H-U-I, H-U-L-I-A-U, I believe is right.

16   Q     And how do you -- say that again one more time.

17   A     Hui Huliau.

18   Q     And do you know why Hui Huliau was chosen as the purchaser

19   or potential purchaser of the Kaya stock?

20   A     Well, they had a lot of the characteristics we were

21   looking for.  It is a Native Hawaiian Organization.  It was

22   actually a firm that was recommended to us by our CPA,

23   longstanding CPA.  And he thought that an introduction would

24   be -- would be beneficial.  And as it turned out, you know,

25   there was interest on both sides.
```

1  Q     And as a Hawaiian Native or a Native Hawaiian Corporation,

2  did Hui Huliau bring with it that perpetual 8(a) status that

3  you have described?

4  A     Yes.

5  Q     And did you review that as some potential benefit to Kaya?

6  A     Absolutely.

7  Q     How so?

8  A     Well, it would have given us a shot at getting back into

9  those projects, those contracts that were in the 8(a) program

10  that our customers actually wanted us to have, wanted us to

11  procure.  So it would have given us the opportunity to get back

12  in with the customers that we had been working with.

13  Q     If you would, take a look at Tab 2, what I have marked as

14  Exhibit 2 in the binder you have in front of you.

15  A     Yes.

16  Q     There's quite a bit of material, but if you would, take a

17  look and tell me what that is, if you can, please, sir.

18  A     It's a transaction agreement between Briefne and Hui

19  Huliau to purchase Kaya Associates.

20  Q     Okay.  If you would --

21         MR. ENGLISH:  Well, first of all, Your Honor, we would

22  offer Exhibit 2.

23         THE COURT:  No objection?  Be admitted.

24  BY MR. ENGLISH:

25  Q     Take a look -- let's identify some documents so we can

 1  talk about them.  Take a look at Tab 3 if you would, please,

 2  sir.

 3  A    Yes, sir.

 4  Q    Will you tell us what that is?

 5  A    This is the loan and security agreement for the purchase

 6  of Kaya by Hui Huliau.

 7  Q    Okay.  And who are the parties to that agreement?

 8  A    Kaya and John Prince.

 9          MR. ENGLISH:  Your Honor, we would offer Exhibit 3.

10          MR. PARKER:  No objection.

11          THE COURT:  Be admitted.

12  BY MR. ENGLISH:

13  Q    Take a look at Exhibit 4, which is at Tab 4 of the book

14  you have in front of you.

15  A    Yes, sir.

16  Q    If you would, tell me what that is.

17  A    It's a promissory note for the Kaya transaction.

18  Q    And who is the borrower?

19  A    Kaya Associates is the borrower.

20  Q    Who is the lender?

21  A    John Prince, myself.

22  Q    What is the face amount of that note?

23  A    $4,481,701.25.

24          MR. ENGLISH:  Your Honor, we would offer Exhibit 4.

25          MR. PARKER:  No objection.

```
1              THE COURT:  Be admitted.
2   BY MR. ENGLISH:
3   Q    Take a look, if you would, at Exhibit 5, that's at Tab 5
4   of the book I have put in front of you, if you would, sir, and
5   tell us what that is.
6   A    That is the guaranty provided by Hui Huliau for the
7   promissory note and for the purchase of Kaya.
8              MR. ENGLISH:  Your Honor, we would offer Exhibit 5.
9              THE COURT:  Be admitted.
10  BY MR. ENGLISH:
11  Q    Take a look at Tab 6, if you would, please, sir, and tell
12  me that is.
13  A    This is a pledge agreement for the same transaction.
14  Q    Okay.
15             MR. ENGLISH:  Your Honor, we offer Exhibit 6.
16             THE COURT:  Be admitted.
17  MR. ENGLISH:
18  Q    All right.  Looking at the --
19             THE COURT:  I assume defendants have gone through
20  this.  Is it your intention to not object to any of these
21  exhibits as they're offered?
22             MR. PARKER:  Well, to the extent we have seen them
23  before, we just -- as he goes through them.  I want --
24             THE COURT:  Okay.  All right.
25  BY MR. ENGLISH:
```

1  Q    Mr. Prince, if you would, let's focus on Tab 3, the loan

2  agreement, or Exhibit 3.

3  A    Yes.

4  Q    The document speaks for itself.  And I don't want to waste

5  the Court's time having you read anything.  But just I want to

6  touch on some points so that at least we've talked about how

7  you understand things are supposed to work.

8       And so, generally, if you would, focusing on Section 1.01

9  of Exhibit 3, tell us your understanding of how the loan

10 agreement works.

11 A    The way -- the loan agreement was structured with as two

12 tranches -- the initial tranche, Tranche 1 or Tranche A, I

13 should say, is $3,287,500, and the Tranche B loan, the value is

14 1,314,201.

15      The purpose of the two loans -- the Tranche A loan was for

16 the actual purchase of Kaya.  The Tranche B was an incentive --

17 incentive portion of the transaction that provides me with

18 incentive to help create additional business base for Kaya.

19 Q    And I've never been accused to being fast or great at

20 math, but if I add these numbers up, do I get pretty close or

21 maybe even exactly the amount of the promissory note?

22 A    Yes.  Yes.  That's correct.

23 Q    Now, 4.5 million roughly is less than the 6.3 we saw in

24 the original promissory note; is that right?

25 A    That's correct.

1   Q    Tell me, if you know, what happened to the -- or why there

2   is a difference between these two promissory notes?

3   A    I ended up with $2,000,000 as part of the sale that was

4   taken off of -- taken from the -- it wasn't included in the

5   promissory note.  It was payment to me.

6   Q    Take a look, if you would, back at Exhibit 3, Section

7   1.03.2, which is on page 2.

8   A    Yes.

9   Q    To your knowledge, Mr. Prince, have you ever received

10  what's been defined here as indemnification claim from Kaya?

11  A    Not that I am aware of.

12  Q    Or on behalf of Kaya?

13  A    Not that I'm aware of.

14  Q    Tell us generally -- and, again, the document speaks for

15  itself.  I don't want you to read it.  But, just generally,

16  what's your understanding of the payment structure that's

17  spelled out in this loan agreement?

18  A    There was to be quarterly payments of interest on the

19  outstanding balance.  And then there was also a quarterly --

20  quarterly payment against the principal that represented

21  30 percent of free cash flow.

22  Q    I see down here at the bottom of page -- or, excuse me --

23  of Section 1.03.2 a definition for quarterly sweep amount?

24  A    Yes.

25  Q    Is that the component of principal that was to be paid on

1  a quarterly basis?

2  A    Yes, it is.

3  Q    It looks like it's greater of zero or an amount calculated

4  by the borrower equal to 30 percent of the borrower's free cash

5  flow.

6  A    That's correct.

7  Q    Now, did you receive payments under the note that we have

8  seen that's Exhibit 4, I believe?

9  A    I have received interest payments.  I wasn't aware of any

10  principal payments.  But I think there has been one payment

11  made out of the various -- what I get is a -- typically, a

12  quarterly interest payment that's direct deposited.  I don't --

13  so it's -- I can't really tell very easily if there's any

14  principal paid at all.

15  Q    Let me ask you a couple of questions there.

16  A    Yes.

17  Q    Do you get any memorandum or detail breaking down that

18  payment when you receive it?

19  A    No, I don't.

20  Q    All right.  What is your understanding of the amount of

21  the interest payments that have been made under the loan

22  agreement and the note?

23  A    It's approximately 49,000 and change.  I don't know the

24  exact amount, but roughly 49,000.

25  Q    And was there one time you said you got more than that?

1  A    Yes.  There was one payment of 57,000 that was deposited

2  into my account.

3  Q    Do you know what that roughly 7 or 8,000-dollar difference

4  was?

5  A    You know, I didn't even notice it until I went and looked

6  back the other day.  It was just another transaction of 57,000.

7  They really didn't differentiate between principal and

8  interest.

9  Q    So at least there's $7,000, $8,000, whatever the number is

10  there, that might be principal?

11  A    Yes, that's true.

12  Q    Other than that one payment of 57, $58,000, have you ever

13  received a payment greater than the interest payment amount of

14  49,000 and change?

15  A    I don't think so.  They have all been right around the

16  49,000 mark.

17  Q    The loan agreement you have identified first, Tranche A

18  and Tranche B loan?

19  A    Yes.

20  Q    Is the Tranche B loan due yet?

21  A    It was a three-year term, but from my perspective, yes,

22  it's due now.

23  Q    Why is that?

24  A    There was a late -- the July payment of interest was not

25  made, and we notified them of that fact.

1  Q    Okay.  Let's get to that in just one second.

2       Flip -- just to again highlight some of these for Judge

3  Burke.  We're not going to read them.

4  A    Yes.

5  Q    Flip to page 4 in the loan agreement, which is Exhibit 3,

6  I believe.  And Section 1.06.2.

7  A    Yes.

8  Q    Just generally, what's your understanding of that,

9  particularly the first part of that provision?

10 A    The payments are to be made on the specified due date

11 without notice or demand by the lender.

12 Q    Section 2.01 on page 5, if you would, tell us generally

13 what you understand that to be.

14 A    This represents the --

15      THE COURT:  Hold on one second.  Do we have an

16 objection?

17      MR. PARKER:  It's kind of -- I think I've missed

18 something.  When he said that was due and payable, I think he

19 might have been talking about Tranche A, not B.  I'm not sure.

20 He said Tranche B, but I --

21      MR. ENGLISH:  Oh.  It should be Tranche A.

22      MR. PARKER:  Okay.  That's what I --

23      MR. ENGLISH:  Yes.  You're right.

24 BY MR. ENGLISH:

25 Q    All right.  2.01 on section -- or page 5.

1  A    Yes.

2  Q    Can you tell us generally what your understanding of that

3  section is?

4  A    That section describes a security for the loan, for the

5  Tranche A loan.

6  Q    All right.  And how about turning the page to page 6,

7  Section 2.03?

8  A    Yes.

9  Q    Tell us what you understand that section to be.

10 A    My understanding of setoff is that any payments that I

11 receive of any kind is something that I can apply to the

12 contract, the sales agreement.

13 Q    You mentioned a late payment in the summer of 2019.

14 A    Yes.

15 Q    Did that late payment subsequently get made to you?

16 A    It did.  It was made just prior to our face-to-face

17 meeting in August.

18 Q    We'll talk about that in a minute.

19      Let's see.  Did you, as part of this loan agreement, did

20 you negotiate any terms that you believed would govern the

21 operation of Kaya?

22 A    Yes.  To me it was pretty logical, pretty standard.  What

23 I expected was that Kaya's revenues would be used towards the

24 operation of Kaya and for repayment of the loan.

25 Q    Take a look --

1  A    But we -- go ahead.

2  Q    Take a look beginning on page 10 and continuing, I

3  believe, through page 12, and tell me if those provisions under

4  Section 4 covenants are the ones you're referring to.

5  A    Yes.  Yes.

6  Q    All right.  And let me call your attention particularly to

7  the bottom of page 12, Section 4.18?

8  A    Yes.

9  Q    Would you read that sentence, please?

10 A    Loans to third parties.  Borrowers shall not extend or

11 allow to remain outstanding any loans or advances to borrower

12 and any third party without the prior written consent of the

13 lender.

14 Q    Take a look at the next page, page 13, under Section 6,

15 Events of Default.  And under Section 6(a) there at the top,

16 tell us generally without reading it what you understand that

17 to be.  What event of default that culls out.

18 A    It's -- what A states is that any failure to pay when due

19 and payable any portion of the principal or interest on the

20 Tranche A loan, then that constitutes a breach of the

21 agreement.

22 Q    Take a look, if you would, at Tab 7, which I have marked

23 as Exhibit 7 to this hearing.

24 A    Yes.

25 Q    Can you tell us what that document is, please, sir?

```
 1  A    That is a letter that I requested Maynard Cooper write to
 2  Hui Huliau when the payment was missed in July.
 3  Q    Are you copied on this letter?
 4  A    Yes, I am.
 5           MR. ENGLISH:  Your Honor, we offer Exhibit 7.
 6           MR. PARKER:  No objection.
 7           THE COURT:  Be admitted.
 8  BY MR. ENGLISH:
 9  Q    What is the date of this letter, Mr. Prince?
10  A    August 15th, 2019.
11  Q    When was the payment that you mentioned that was missed
12  due?
13  A    July -- it would have been within the first ten days of
14  July.
15  Q    So this letter is after the payment had been missed?
16  A    Yes.
17  Q    When did the payment subsequently get deposited into your
18  bank account?
19  A    It was a few days before our -- my scheduled meeting with
20  Mr. Russell in August.
21  Q    And not holding you to any particular date, but looking at
22  the date on the letter that is Exhibit 7, August 15th, can you
23  give the Court a judgment as to when that meeting took place
24  and when that payment was made?
25  A    I believe the meeting took place on about the 24th of
```

```
 1  August.  I should have checked the exact date.  But somewhere

 2  around the 24th of August.  The payment was several days prior.

 3  So somewhere between the letter from Maynard Cooper and my

 4  meeting with Mr. Russell.

 5  Q    Was there any forewarning, or did anyone tell you they

 6  were about to deposit money in your bank account?

 7  A    No, there wasn't.

 8  Q    Have you returned that money to Hui Huliau or Kaya?

 9  A    No, I have not.

10  Q    And why not?

11  A    Based on the setoff clause in the contract.

12  Q    All right.  Tell us, if you can, without talking about

13  specific things that were mentioned -- well, first of all, who

14  did you meet with from Hui Huliau after the letter that is

15  Exhibit 7 that was sent?

16  A    Mr. Howard Russell.

17  Q    Okay.  And who do you understand Mr. Russell to be?

18  A    He is the chief financial officer of Hui Huliau.

19  Q    Okay.  And just generally tell us the things that you

20  discussed in that meeting.

21  A    Well, we discussed the fact that he didn't -- Hui Huliau

22  didn't seem to be complying with the agreement.  The payments

23  were late.

24       When I -- and I had -- what we talked about was the

25  viability -- at that time, there was only one year left of a
```

1  three-year repayment for this Kaya loan.  And not only at that

2  point in time, there was no -- other than the $7,000, which I

3  didn't even realize, there was no payments made to principal,

4  and an interest payment had been late.

5       So the conversation with Mr. Russell had to do with,

6  number one, how are you going to pay me within the next year?

7  I mean, nothing appears to be moving in the right direction.

8       So what we discussed was the viability of them upholding

9  their end of this deal.  And then we also talked about -- and

10 when I expressed to him that I have serious doubts and serious

11 concerns that you are going to be able to make this note, that

12 -- and that you have already -- you have already violated the

13 terms of the agreement, and what I would like to do is have a

14 constructive conversation of how to bring Kaya back, bring --

15 return Kaya to me so -- before any further damage was done.

16 Q    Did you, during the course of the discussions you have had

17 with Mr. Russell, or at any time, agree to waive the default

18 that resulted from the late payment last summer?

19 A    Oh, absolutely not.  No.

20 Q    Did you at any time, during the discussions you described

21 with Mr. Russell or otherwise, agree to allow Hui Huliau or

22 Kaya to cure that default?

23 A    No.  Huh-uh.

24 Q    Let's flip back to Exhibit 3, the loan agreement.  On page

25 13 where we left off.  Let me know when you're there, sir.

1  A    Page 13, did you say?

2  Q    Yes, sir.  Of Exhibit 3.

3  A    Yes, sir.

4  Q    Let's look at on page 13, Section 6, Events of Default, we

5  talked about Section A.  Talk about your understanding, if you

6  would, without reading it, of Subsection C.

7  A    It describes the -- an event of default.  Let's see.

8  Q    If you want to take a second to look at it.

9  A    Yes.  Thank you.

10 Q    Let me ask you a better question, Mr. Prince.

11 A    Yes.

12 Q    Do you understand Section C to be tied to the covenants

13 that we saw earlier in Section 4 of this agreement?

14 A    Yes.  Yes.  And this describes that if -- failure to

15 uphold those covenants would constitute a default.

16 Q    Let's take a look at Exhibit 9 in the book you have in

17 front of you.

18 A    Yes.

19 Q    Can you tell us what we see at Exhibit 9?

20 A    These are the CPA prepared year-end financials for Kaya

21 for years 2017 and 2018.

22 Q    Well, if you take a look, Mr. Prince, the e-mail that --

23 well, does it appear the first page is an e-mail from Howard

24 Russell to you dated November 14th, 2019?

25 A    Yes, it is.

1  Q    And did you receive that e-mail?

2  A    I did.

3  Q    And did it carry with it the attachments that are listed

4  there under the attachment line?

5  A    Yes.

6  Q    And I don't know that I put all of these attachments in

7  this exhibit, but did you receive them?

8  A    Yes, I did.

9  Q    And tell us, if you would, what the rest of Exhibit 6 --

10  excuse me -- Exhibit 9 is.

11  A    They're the actual CPA prepared financial reports for 2017

12  and '18.

13  Q    They were provided to you by Mr. Russell?

14  A    Correct.

15         MR. ENGLISH:  Your Honor, we offer Exhibit 9.

16         MR. PARKER:  No objection.

17         THE COURT:  Be admitted.

18  BY MR. ENGLISH:

19  Q    Turn to page 14 of the financial statements that are part

20  of Exhibit 9, if you would, please, sir.

21  A    In '17 or '18?

22  Q    In '18.  I'm sorry.

23       Let me ask you a clear-up question, because I didn't put

24  the '17 ones in my book.  But are the '17 financials in your

25  exhibits?

1  A    Yes.

2  Q    Okay.  So both the '17 and '18 financial statements that

3  were sent to you by Mr. Russell are a part of Exhibit 9?

4  A    Yes.

5  Q    Look at the ones from 2018, if you would, please, sir.

6  Page 14.

7  A    Yes.  I'm there.

8  Q    Do you see Section 8 titled, Related Party Transactions?

9  A    Yes, I do.

10 Q    And then you see the second paragraph that says the

11 company lends money for various support services, such as

12 insurance, to its parent organization Hui Huliau, Inc.?

13 A    Yes.

14 Q    And it goes on to describe other intercompany loans; is

15 that right?

16 A    Yes, it does.

17 Q    Did you know anything about intercompany loans between

18 Kaya and other parts of the Hui organization?

19 A    I was never consulted by any of these -- for any of these

20 transactions.

21 Q    Prior to seeing these financial statements, did you know

22 anything about it?

23 A    No, I did not.

24 Q    So is it fair to assume that you didn't approve or agree

25 to allow those loans to be made?

1  A    I did not approve any of these transactions.

2  Q    All right.  If you would, Mr. Prince, let's just talk

3  about a couple of other documents quickly as I wrap up.

4       If you would, flip to Exhibit 5, which I believe you

5  identified earlier --

6  A    Mr. English, can I step back a minute?

7       You asked a question earlier is this the first time that I

8  have seen -- there was actually a preliminary -- because it

9  just dawned on me.

10      After my August meeting with Mr. Russell, he provided me

11 with some initial -- some preliminary financials, not CPA

12 prepared internal financials, and it caused me to question what

13 was going on.  And there was a line item in there that talked

14 about -- there was a line item about -- I'm trying to remember

15 what the terminology was, but essentially was third-party

16 loans.

17      So that caused me to start asking questions and demanding

18 these CPA prepared financials.

19 Q    And when you saw that entry in the financial statements

20 that I guess Mr. Russell had given you prior to November, did

21 you ask him what the loans were about?

22 A    Yes, I did.

23 Q    What did he tell you?

24 A    What he told me, it was more -- it was an accounting

25 exercise.  And that, you know, it was accumulated at Kaya, but

1   it didn't represent an obligation for Kaya.

2   Q     Okay.

3   A     And then that subsequently that would all be cleared up.

4   Q     Okay.  To your knowledge, has any of that been cleared up?

5   A     I don't believe it has.

6   Q     We will ask somebody else maybe a little bit about that.

7         Flip back to the guaranty, which I believe is Exhibit 5.

8   A     Yes.

9   Q     Let's see.  Who is this guaranty made by?

10  A     Hui Huliau.

11  Q     And let's look at the pledge agreement that I believe is

12  Exhibit 6.

13  A     Yes.

14  Q     And what is your understanding of what this document does?

15  A     Well, I think you just said it.  It's a pledge agreement

16  between Hui Huliau and John Prince, myself.

17  Q     And what is pledged, if you know?

18  A     The company stock.

19  Q     Do you see an assignment separate from certificate as part

20  of that exhibit?

21  A     Yes, I do.

22  Q     All right.  Have you ever heard of a company called 4P?

23  A     I have heard of the company, yes.

24  Q     What is your understanding of what 4P is?

25  A     4P, from what was explained to me, represents -- it's a

1  management company that's outside of the Hui Huliau

2  organization.  And it's a management company -- the way it was

3  described to me is it's the compensation -- it's a compensation

4  for the senior executives of Hui Huliau.

5  Q    Okay.  Did you know anything about 4P when you entered

6  into the transaction with Hui Huliau?

7  A    No, I did not.

8  Q    When did you first find out about 4P?

9  A    I believe -- I believe it might have been part of the --

10  Mr. English, I don't recall exactly how I heard about it.  I

11  was aware of it before my meeting with Mr. Russell, because it

12  was a topic of conversation.

13  Q    And what, if anything, do you understand 4P to be doing on

14  behalf of Kaya, if anything?

15  A    I'm not aware of it doing anything for Kaya.

16  Q    Are you aware of any payments that are made to 4P?

17  A    Yes.

18  Q    What is your understanding about that?

19  A    My understanding, one of the discussion points in the

20  August meeting was the management fee.  It was minimizing all

21  of the charges that are outside of the normal course of

22  business.  And eliminating those during this period when I'm

23  trying to get Kaya back.  It was -- at the time, it was $20,000

24  a month.

25  Q    Okay.  Every month?

1   A     Every month, yes.

2   Q     What effect, if any, do you believe that had on your

3   ability to get repaid?

4   A     Well, it factors directly into the 30 percent of free cash

5   flow that was due to me each quarter.

6   Q     How does it factor indirectly?

7   A     Pardon me?

8   Q     You say it factors indirectly.  What does it do to the

9   free cash flow, if you know?

10  A     Actually, I said directly.  It directly affects the free

11  cash flow because you are taking profits out of the company

12  each month to the tune of $20,000.  Therefore, it eliminates

13  any profit potential for me.

14  Q     Do you have any understanding as to how long these $20,000

15  a month payments have been made to 4P?

16  A     I don't -- I don't know specifically.  I just know it's

17  been ongoing since my meeting with Mr. Russell.

18  Q     Did Kaya have a line of credit when you entered into the

19  transaction with Hui Huliau?

20  A     Yes.

21  Q     Do you know what that balance was?

22  A     The line of credit was for $2,000,000 roughly, and the

23  balance was zero.

24  Q     Have you had any conversations with Regions recently?

25  A     I have.

1  Q     And does Regions have any relationship to that line of

2  credit that Kaya has?

3  A     Yes.  They own that -- they continued to service that line

4  of credit as the banker.

5  Q     Do you have any understanding as to what the status of

6  that Kaya line of credit with Regions is today?

7  A     My understanding is it's almost maxed out to the tune of

8  about $1.7 million.

9  Q     In connection with your conversations, communications with

10 Regions, did you tell them about these proceedings?

11 A     Yes.  I notified them that I was looking to -- I was

12 seeking to get Kaya back.

13 Q     And do you have any understanding from those

14 communications with Regions as to Kaya's current status with

15 Regions?

16 A     Yes.  They cautioned me that -- that I could be -- I could

17 be taking on a mess.  They were --

18         MR. PARKER:  Objection to characterization.

19         THE COURT:  Hold on one second.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Objection to what, now?

22         MR. PARKER:  I think the witness should maybe just

23 stick to the facts.  The characterization is this could be a

24 mess.  I think that's a bad reflection, in terms of

25 relationship between borrower Kaya and Regions Bank.

```
 1              MR. ENGLISH:  I will ask a different question.
 2              THE COURT:  Okay.
 3              MR. ENGLISH:  That will solve it.
 4    BY MR. ENGLISH:
 5    Q    What was your understanding in your words as to the status
 6    of Kaya with Regions Bank that you gained from your
 7    communication with Regions Bank?
 8    A    I learned a new term from Regions that day.  It's called
 9    special assets from Regions Bank.  And what he explained to me
10    was it was about to be in special assets status.
11    Q    What did you understand special assets to be?
12    A    To be honest, I still don't understand exactly what it
13    means, but my understanding is it's very -- the scrutiny is
14    increased greatly, and your ability to operate as a company is
15    severely impacted.
16    Q    Take a look, if you would, at Tab 8, which I have marked
17    as Exhibit 8 to this proceeding.
18    A    Yes.
19    Q    Tell me if you would, sir, what that document is.
20    A    This is an e-mail from Howard Russell to me, and it's an
21    ongoing -- it's part of the ongoing dialogue of trying to work
22    things out over the past eight months or so, six months or so.
23    Q    And it looks like these e-mails are from February 13th of
24    this year?
25    A    Yes.
```

1   Q    Take a look at the bottom e-mail that looks like
2   Mr. Russell sent to you on February 13th at 10:03 a.m.?
3   A    Yes.
4   Q    Do you see the paragraph that begins with "specifically"?
5   A    Yes.
6   Q    Mr. Russell wrote, Specifically, as it relates to Kaya,
7   our initial findings have uncovered significant irregularities
8   that have caused Kaya in excess of six figures -- and then in
9   parentheses -- maybe even seven figures in profitability.
10       Do you see that?
11  A    Yes, I do.
12  Q    Do you have any understanding how these irregularities
13  could have impacted you?
14  A    I think it impacted my payments directly.  This by
15  having -- I mean, he's stating that possibly seven figures
16  worth of charges are erroneous to Kaya.
17  Q    I think he used the term "profitability," doesn't he?
18  A    The profitability, yes.
19  Q    Were you to be paid out of profit?
20  A    Yes.
21  Q    Mr. Russell then writes about a final report that would be
22  available to him tomorrow.  Do you see that?
23  A    Yes.
24  Q    And the next sentence he says, We will share with you on
25  Monday not only the results of this report, but far more

1 details as to how your loan will be repaid.

2      Do you see that?

3 A    Yes.

4 Q    Have you received any sort of report from Mr. Russell?

5 A    I have received no report.  The only thing I received was

6 a short e-mail that I believe was supposed to represent the

7 repayment plan that's also referred in this e-mail, and the --

8 that really wasn't a plan at all.  It just said, well, we're

9 going to pay you some in February.  We're going to pay you some

10 in May.  And we'll pay you the balance in September of this

11 year, but if we don't -- if we're not able to make that, then

12 we will pay you more interest.

13          MR. ENGLISH:  Your Honor, I should have done this

14 earlier, but I am going to offer Exhibit 8.

15          THE COURT:  No objection?

16          MR. PARKER:  No objection.

17          THE COURT:  Be admitted.

18 BY MR. ENGLISH:

19 Q    All right.  Let's talk about the entity itself.  Do you

20 have any concerns as we sit here today that you want to express

21 to Judge Burke as to Kaya's current operations?

22 A    I do.

23 Q    All right.

24 A    I do.  Judge, we, as I stated earlier, we started in 2004

25 and tried do everything right, you know.

1         We had good customers.  We had great employees.  We

2    tried -- we paid our bills on time.  We built a nice, very

3    solid D&B rating.  We operated with a defense contract audit

4    agency, who was critical on allowing you to perform on your

5    contracts with the government.  We -- so our relationship with

6    DCAA was stellar.

7         Our customer relationships were great.  As an operation,

8    we tried to do everything right.  And we gained a very good

9    reputation, an excellent reputation in the community.

10        With our employees, with our staff, we had a very robust

11   profit-sharing bonus programs.  And we tried -- like I said, we

12   tried to do everything right.

13        What I am seeing unfolding in front of me is, you know,

14   aside -- the money aside, I mean, I'm watching the way this

15   company is just coming apart right now.  Financially, it's in

16   dire straits.  It's about to be put into special assets status.

17        We've lost -- I had a controller who had been with me

18   since, I believe, about 2006.  She was outstanding.

19   Outstanding in everything she did.  And she was a big part of

20   why we were --

21             MR. PARKER:  Your Honor, I didn't want to interrupt

22   the witness necessarily, but is there a question here that he's

23   answering?  And --

24             THE COURT:  It's open ended.  I will let him narrow it

25   down.

1           MR. PARKER:  That would be great.  Thank you.

2           THE COURT:  I will let him narrow it down.

3           THE WITNESS:  Am I being a little too expansive?  Is

4    that the --

5           THE COURT:  A little bit, but he is going to fix that.

6    BY MR. ENGLISH:

7    Q    I am going to fix it hopefully.

8    A    Well, so --

9    Q    Let me as you a question, Mr. Prince.

10   A    Yes.  Go ahead.

11   Q    As it relates to human resources or people, do you have

12   any concerns as relates to Kaya?

13   A    Yes.  First my president, my former president has resigned

14   as of two weeks ago, about two weeks ago.  And his resignation

15   was really the death blow, if my mind, for the prospects of

16   succeeding -- of success.  When I found out Steve had resigned,

17   I didn't see any chance of the company surviving past that.

18        But even prior to Steve, we also lost one of our guys,

19   Buck Etheredge (phonetic), who is -- Buck is -- I mean, he's a

20   senior air traffic control technician and project manager.  But

21   his value is awesome.  I mean, he is the face to our customers.

22   He --

23   Q    Do you know when Mr. Etheredge left?  Etheredge?

24   A    When did he leave?

25   Q    Yeah.

```
 1  A    He was laid off this week.  Fully billable.  The customers
 2  love him.  He is a key part of the operation.  But for some
 3  reason he was -- he was laid off.
 4  Q    All right.  Let's talk about what you mean by fully
 5  billable.
 6  A    Fully billable --
 7  Q    Judge Burke may not have dealt government contracts like
 8  we have.  So tell us what you mean by that.
 9  A    Fully billable, Judge, means the customers bought and paid
10  for his support.  So he is generating revenues for the company.
11  He is not charging -- he is not an overhead charge.  His time
12  is billable to the customer, to the contract.  So he's
13  generating revenues.
14  Q    And is he an important, in your judgment, an important
15  part of the relationship between Kaya and certain customers?
16  A    Yes.
17  Q    Tell us about that.  Which customers?
18  A    Well, the primary customer is PM -- I will describe the
19  acronym.  PMATC.  It's Program Management for Air Traffic
20  Control for the Army.  And Buck -- his name is Brian Etheredge.
21  I will call him Buck, as everyone does.
22       Buck is involved in just about every facet of PMATC.
23  Every customer face we have over there is very familiar with
24  Buck.  They think very highly of Buck.
25       He was also -- he was also -- he and I closed the deal for
```

```
 1  -- he brought the opportunity for providing air traffic
 2  controllers in Iraq for ten years.  And so he brought that in.
 3  We worked on that proposal for a period of years, actually.
 4  And it finally was awarded.
 5       Kaya's in the second year of a ten-year contract for those
 6  air traffic controllers in Iraq.  And Buck was right in the
 7  middle of that, as well.
 8  Q    Do you have --
 9  A    So he was a key resource.
10  Q    Do you have concerns about Kaya's ability to continue that
11  ten-year contract without Mr. Etheredge?
12  A    It throws it into doubt certainly.  Absolutely it does.
13  Q    He was laid off within the last week?
14  A    I believe it was last Monday that he was laid off.
15  Q    Since this lawsuit has been filed?
16  A    Yes.
17  Q    All right.  So the last thing I want to ask you,
18  Mr. Prince, we are here asking Judge Burke for injunctive
19  relief.  I want you to take a second and tell him -- tell the
20  Court why you think we should be -- he should issue the
21  injunction we have asked for.
22  A    As I started -- I will try not to be so expansive this
23  time.  But as I started to explain earlier, there's the
24  financial toll on the company.
25       One of the things that we tried to do with Kaya was always
```

1  make it financially sound.  One of the criteria for winning a

2  contract is you have to show a level of responsibility,

3  financial responsibility.  You have to show that you're

4  financially viable.

5      So that, among -- that being one of the major reasons, we

6  were always financially solid.  But that is in jeopardy now.

7      Our relationship with DCAA -- we were actually given a

8  rare status.  I want to say it was called a low-risk status by

9  the defense contract auditing agency.  And what that means is

10 that we have demonstrated over the years a competence and an

11 honesty in our accounting systems that DCAA doesn't --

12 considers us to be low risk.  So there's not as much monitoring

13 by DCAA.  We're able to get things turned around very quickly

14 because of that favored status.  But I believe that's going to

15 be -- that's in jeopardy, as well.

16     We're losing resources -- we're losing human resources.

17 You know, I have only mentioned a couple of the key personnel

18 that we have lost.  There are others.  These are people that

19 have been with me for years.  They're critical to the business.

20 And they're either being -- they're either leaving because of

21 the business conditions, or they're being terminated.

22     There's also part of the air traffic control system, or

23 operation includes a facility, a fabrication facility in

24 Charleston, in north Charleston.  There's this -- there's an

25 active effort right now to sell off that division.  And

1  that's -- it's a key component of the overall air traffic

2  control business.

3      So for all those reasons, my concern is that I get this

4  company back, it's going to be -- it's going to be in a

5  condition that I can't revive it again.

6  Q    I think we established earlier the stock is part of the

7  collateral for the repayment of the loan, correct?

8  A    That's correct.

9  Q    So one of the remedies you would have in the event of a

10  default is to take the stock back, correct?

11  A    Correct.

12  Q    And do you believe that if, without the injunction we have

13  sought, which, you know, require Kaya to maintain sort of

14  normal business operations -- do you have any prospect in your

15  mind of getting repaid?

16  A    I do not.  I mean, there's none of the terms that we

17  discussed in August along those lines of only spending money

18  for ordinary course of business.  I mean, none of that has been

19  honored since that time.

20          MR. ENGLISH:  Your Honor, may I have one second to

21  confer with Mr. McArthur?  I think I'm done.

22          THE COURT:  Yes.

23          MR. ENGLISH:  Your Honor, that's all the questions I

24  have.

25          THE COURT:  Cross?

```
1                        CROSS-EXAMINATION
2   BY MR. PARKER:
3   Q    Good morning, Mr. Prince.  How are you?
4   A    Good morning.  I'm good.  Thank you.
5   Q    That's so appreciated.  I don't think as long as I have
6   been involved in this matter I got to hear that whole story of
7   how Kaya was developed.
8         A couple of questions for you to start.  You have
9   testified there was a transaction in 2017 by which you sold
10  your interest in Kaya Associates; isn't that correct?
11  A    Yes.
12  Q    You don't own any interest in Kaya Associates as we speak
13  here today, and you haven't owned any interest in Kaya since, I
14  believe, September 2017, right?
15            MR. ENGLISH:  Your Honor, I am going to object just to
16  the extent that we're talking about the collateral, which would
17  be the stock, which he's trying to get back.  But with that
18  clarification.
19            THE WITNESS:  Right.  Right.
20            THE COURT:  I understand.
21            THE WITNESS:  That's what I was going to answer, as
22  well.
23  BY MR. PARKER:
24  Q    You have not owned, and Hui Huliau owns Kaya; is that
25  correct?
```

1  A    That's correct.

2  Q    All right.  And has owned them since September 2017?

3  A    That's correct.

4  Q    So I just -- because when you're talking about "we," you

5  know, I am confused whether you are talking about the companies

6  that you owned, and you talked about KFS, or whatever, because

7  Kaya is Hui -- Hui Huliau.  And they've owned it since that

8  time?

9  A    That's correct.

10  Q   And it's -- and you would agree it's, you know, it's their

11  duty to run the company, you know, the way they want to, right?

12  A   Yes.  Within the constraints of our agreement, certainly,

13  yes.

14  Q   And I guess part of this agreement back in 2017 -- and you

15  walked through it with your counsel -- is that they created,

16  you know, what we would call in the business sort of a seller

17  financed agreement.  You talked about Tranche A, right?

18  A   Yes.

19  Q   And you talked about Tranche B, right?

20  A   Yes.

21  Q   And that defines your relationship, you know, with Hui

22  Huliau, right?  In that the way you described Tranche A is that

23  I believe your counsel used the numbers -- what is it?  Sort of

24  about a $3.2 million number, $3.3 million number constituted

25  what you would be deserving of getting from Tranche A --

```
 1  A      Yes.

 2  Q      -- if it played itself out?

 3  A      Yes.

 4  Q      And I think that the way Tranche A played itself out --

 5  and tell me if I'm wrong -- is that, you know, you would get

 6  these quarterly interest payments, and I think they would be

 7  due on the 15th of every month.  And those quarterly interest

 8  payments started after September 2017, and they would continue

 9  throughout the course of those three years, and there would be

10  some type of balloon payment or so in September 2020.  Is that

11  how it works?

12  A      Well, not exactly.

13  Q      Okay.

14  A      There was also a component that there was 30 percent of

15  free cash flow should have been paid each quarter, as well.

16  Q      Well, I was just talking about the interest payment,

17  component, okay?  I was just talking about that.

18  A      Okay.

19  Q      All right.  And then you are correct.  If there was a

20  30 percent free cash flow, then there would be an additional

21  payment of principal as part of that over the course, right?

22  A      Yes.

23  Q      And I think you've testified that to date you have

24  received all the interest payments since they first began in

25  2017.  I think even the latest interest payment was probably,
```

 1 | what, January 2nd?

 2 | A    That's correct.

 3 | Q    You know, 2020?

 4 | A    Yes.

 5 | Q    So interest payments have been paid, right?

 6 | A    Yes.

 7 | Q    Okay.  And then this Tranche B was -- you explained it as

 8 | being, I guess, related more to incentives or something?

 9 | A    That's correct.

10 | Q    Right?

11 | A    That's correct.

12 | Q    And that amount of what the Tranche B was -- let me see

13 | here.  Roughly, what, $1,314,201 or something?

14 | A    Yes, that sounds correct.

15 | Q    So I'm going to check Mr. English's math, because he's --

16 | if you add it up, then your expectations, in terms of the

17 | relationship that you had with Hui Huliau that began in

18 | September 2017, is that you were looking at a potential --

19 | quantifiable potential of $4,481,701.

20 |     I didn't go to school for math.  I went to school because

21 | allegedly I am good with words.  But am I right, that's your

22 | expectation?

23 | A    That's correct.  Yes.

24 |         MR. PARKER:  I am going to apologize to the Court.  I

25 | thought the complaint would be marked.  But I do have an extra

 1  copy.  I think you guys probably have a copy of this.

 2            MR. MCARTHUR:  It's been filed with the Court.

 3            MR. PARKER:  Can I give the witness this copy?

 4            THE COURT:  Uh-huh.

 5  BY MR. PARKER:

 6  Q    I've placed in front of you, Mr. Prince, the verified

 7  complaint and request for injunctive relief.  You know that was

 8  originally filed in the Circuit Court of Madison County, but

 9  since removed to this fine court here.

10  A    Yes.

11  Q    Do you remember that being, you know, the complaint you

12  filed?

13  A    Yes.

14  Q    Okay.  All right.  I think I will mark that as -- what

15  Exhibit Number are we on?

16       I will mark mine Defendant Exhibit 1.  I will mark that.

17  And with no objection?

18            MR. ENGLISH:  No objection.

19            MR. PARKER:  Okay.

20  BY MR. PARKER:

21  Q    I would like to ask you about a couple of -- or the

22  allegations in this complaint, Mr. Prince.

23            MR. ENGLISH:  May I swing around and read on with

24  Mr. Prince?

25            THE COURT:  Yes.

1            MR. PARKER:  I apologize about that.  I just thought

2    it would be marked and we would have it in front of us.

3            THE COURT:  It's not the end of the world.

4    BY MR. PARKER:

5    Q    I think counsel had some questions or directed some

6    questions to you about what we're seeking here today.  This is

7    an extraordinary relief, you know.  Irreparable harm,

8    injunctive relief.  And I think you said you understood that.

9        Can you take a look at paragraph 17 of your complaint,

10   Mr. Prince?

11   A    Yes.

12   Q    And I will just read it.  I think you're familiar with it.

13       As part of Hui's acquisition of Kaya, Prince agreed to

14   restructure the loan to Kaya reflected in the original loan

15   documents.  On September 6th, 2017, Prince and Kaya entered

16   into an amended and restated loan agreement with Kaya,

17   restructuring Kaya's debt into two tranches -- Tranche A, worth

18   $3,287,500; and Tranche B, in the amount of $1,314,201.  Hui

19   also executed an amended restated promissory note in the amount

20   of $4,481,701.

21       I think that we've gone over this enough, but, you know,

22   that's what you allege to be at issue here.  This is a, you

23   know, you filed a complaint and the complaint is associated

24   with the amended and restated loan agreement.  Your contractual

25   relationship with Hui Huliau is what's at issue, and these are

1  your expectations of damages; is that correct?

2  A    I'm not quite sure I understand your question.  I think

3  what you're asking me is, the terms of my sale with Hui Huliau

4  is reflected here.  If that's what you're saying, I'm saying

5  yes.

6  Q    I guess what I'm saying is that when you entered into the

7  amended and restated loan agreement --

8  A    Yes.

9  Q    -- and that is -- that is, in essence, your relationship

10 with Hui Huliau as a result of the transaction in 2017.  So the

11 2017 reaction occurs?

12 A    Yes.

13 Q    Hui -- Kaya's ownership transfers over to Hui.  And the

14 consideration that you got as it relates to the transition of

15 that relationship was that you went into the amended and

16 restated loan agreement, in which in Tranche A you were going

17 to get the 3.2, 3.3 million amount; and potentially in Tranche

18 B, you are going to get a 1.3 or so million amount.  That's

19 what you expected to get out of this, right?

20 A    Yes.

21 Q    Okay.

22 A    That was the agreement.

23 Q    All right.  Thank you.

24 A    That was the sales agreement, yes.

25 Q    Well, can you take a look at paragraph 63 of your verified

```
 1  complaint and injunctive relief?  That's Count Six.

 2  A     Number 6, did you say?

 3  Q     Count Number Six, page 13, paragraph 63.

 4  A     Yes.

 5         MR. ENGLISH:  This has got some of your markings on

 6  it.  Is that okay?

 7         MR. PARKER:  Let me just check and walk up.  Let me

 8  just stretch a little, anyway.  That's fine.  There you go.

 9  BY MR. PARKER:

10  Q     Paragraph 63 reads, Prince has no adequate remedy at law

11  for the defendant's actions since the damages he will suffer

12  are incapable of exact proof, as is the harm the defendants

13  will impose upon Prince.

14         This is the injunctive relief.  Irreparable harm is what

15  has to be proven today, in addition to other aspects of the

16  cause of action to get this sort of extraordinary relief.  You

17  just told me your expectations and what you expected out of the

18  transaction in 2017 is to be paid in full for Tranche A and in

19  full for Tranche B if you met the incentives.

20         It seems to me that that's inconsistent.  If you're able

21  to quantify it in one sense, I am not sure how you can say what

22  is irreparable and why the Court needs to take extraordinary

23  action at this point in time.  If those are your damages,

24  right?  Those are your damages, which you have just said they

25  are; is that correct?
```

1   A    I don't think I said they were my damages.  I think what I
2   said was that value represents what is in the sales agreement.
3   I thought that was the question you were asking.
4   Q    Well, I think I had restated my question before and I said
5   we understood that Kaya changed hands in 2017?
6   A    Yes.
7   Q    So you no longer own Kaya?
8   A    That's correct.
9   Q    Right?  So you no longer really are running Kaya or need
10  to run Kaya.  So whether it's issues of personnel changes,
11  issues of business decisions, that is the duty now of the
12  progress of Hui Huliau?
13  A    I think I understand now.
14  Q    And as a result of the 2017 transaction, you got, in turn,
15  a seller finance agreement, a contract, the minute restated
16  loan agreement by which you are going to be paid a sum of
17  something like 3 million and 387,000, and potentially 1 million
18  314.  And that was your expectation out of this contractual
19  relationship that you had with Hui?
20  A    Right.  I think -- I understand you -- I think I
21  understand what you're getting at now.
22       But as I stated earlier, my -- I had the meeting in August
23  with Mr. Russell.  It became entirely clear that that
24  repayment -- that payment was not going to happen.  Mr. Russell
25  even admitted to the fact that that would not likely happen.

1     So when -- so as soon as that occurs, then I have to

2  assume, then, if they're not going to meet the terms of the

3  deal, I have got to get my company back.

4  Q    Well, I'm going to --

5  A    So that's the irreparable that I described earlier is that

6  the damage to our reputation, damage to the financial

7  condition, losing key assets, all of those things.

8  Q    Let me just -- I don't want to be rude or disrespectful.

9  A    Sure.  Sure.

10  Q    It's the reputation of Hui Huliau.  It's the reputation of

11  Huliau's management team, not your reputation.  Huliau is owned

12  by Kaya and Associates, okay?

13       MR. ENGLISH:  I'm going to object if that's just a

14  statement.

15       THE COURT:  Sustained.

16  BY MR. PARKER:

17  Q    You also told us, Mr. Prince, that all the interest

18  payments have been made to date, even the last one,

19  January 2nd, 2020.  You also said that the sort of balloon or

20  Tranche payment of Tranche A is not due until September 2020.

21  So Hui is adhering to the amended restatement and loan

22  agreement persistent to its terms.  You are getting what you

23  bargained for.

24  A    But there were also a lot of covenants that are associated

25  with this deal, as well.

 1              MR. ENGLISH:  Hold on.

 2              THE COURT:  Hold on one second.  Your lawyer is

 3   objecting.

 4              THE WITNESS:  Oh, sure.

 5              MR. ENGLISH:  I am still not sure what the question

 6   is.  There was a statement -- I think if he wants Mr. Prince to

 7   respond to that statement, then I don't have an objection.

 8   But, you know, we need to ask questions and answers.

 9              THE COURT:  Well, I took it as a question.  You are

10   getting -- and I'm reading the question -- you are getting what

11   you bargained for.  I took that as a question, so...

12              MR. ENGLISH:  I withdraw my objection.

13              THE COURT:  All right.

14              THE WITNESS:  Okay.  I think I started to answer that

15   there are terms -- there are terms of this agreement that are

16   above and beyond just the payment.  There were also covenants

17   agreed to in the sales agreement that prevented certain types

18   of behavior.

19        Now, when they're making loans to third parties, that's

20   taking directly away from me.

21   BY MR. PARKER:

22   Q    Mr. Prince, do you understand at the end of the day,

23   whether or not you believe that to be true -- they are taking

24   loans from third parties or not.  But at the end of the day,

25   you are to be paid in September, you know, potentially this

1  $4,000,481 amount pursuant to Tranche A and B, notwithstanding

2  what happens with if you believe people are getting loans from

3  Hui to others, or Kaya to others.  That's what you are going to

4  get when that date comes, correct?  Or you perceive or expect

5  to get it when that day comes?

6  A    That was the terms of the deal, yes.

7  Q    That's the terms of the deal?

8  A    Right.  Right.  But when the -- if I can add, I mean, when

9  the principals --

10 Q    You answered my question.

11 A    When the --

12       THE COURT:  Hold on.  He will ask you another

13 question.  If there are other things you want to say, I promise

14 you that Mr. English is going to ask you those things on

15 redirect.

16       THE WITNESS:  Okay.

17 BY MR. PARKER:

18 Q    Also I noticed in the complaint that there were several

19 allegations regarding providing financial reporting

20 documentation, okay?

21 A    Yes.

22 Q    I know you and Mr. Russell have had several conversations

23 since August 15th, I believe, 2017, to the date.  And you have

24 made several requests for financial records.

25       Do you still maintain the position now that you have not

1  been provided the proper financial records?

2  A    I have the 2017.  I have the 2018 financial reports from

3  CPA.

4  Q    The ones that you wanted.  Okay?

5  A    And I'm waiting -- I'm sorry.  Did I say '17?

6  Q    '17 and '18?

7  A    Right.  And then I'm waiting for 2019.

8  Q    Okay.  And I think under the agreement terms, when we

9  provide you with the independent CPA financials, we have, I

10 think, 120 days after that calendar year.  So we need to -- you

11 know, we're up to date, so to speak, on what we have to provide

12 you; is that correct?

13 A    Now you're up to date.  The '17 and '18 were not provided

14 in a timely fashion.

15 Q    But you got those, I believe --

16 A    In November.

17 Q    -- in November of last year.  But you have them now?

18 A    I have them now, yes.

19 Q    So you have everything that you have requested right now,

20 in terms of financial documentation?  I think that --

21 A    There were other things that were promised that have not

22 been delivered yet.

23 Q    But in terms of the agreement and the financial

24 obligations, we have provided you what we promised we were

25 going to provide you?

1   A     I believe you are correct.

2   Q     Okay.  Okay.  You have had a chance to look at the

3   financial statements we've provided you, it seems, based on

4   your testimony; is that correct?

5   A     Yes.

6   Q     Okay.  And I was listening in this exchange, as it relates

7   to interest payment versus principal, that you were having with

8   your counsel.

9   A     Yes.

10  Q     And can you explain to me again your understanding of when

11  you are entitled to a principal payment in addition to

12  interest?

13  A     30 percent of -- the terms call for 30 percent of free

14  cash flow each quarter.  So my expectation would have been each

15  quarterly -- at each quarterly period, the profits would have

16  been calculated, and 30 percent of the free cash flow should

17  have been sent to me.

18  Q     Okay.  I have taken a look at the financial statements

19  that we've provided you.  And can we agree that we do not see

20  that 30 percent number free cash flow to trigger a principal

21  payment in looking at the financial statements that we provided

22  you?

23  A     I believe the terms for the 30 percent payment are in the

24  sales contract, not in the financials, if that's what you are

25  saying.

1  Q    But if we're looking for that equation, in terms of

2  30 percent of free cash flow, that would be reflected in the

3  standard financial statement.

4  A    Yes.

5  Q    So an income statement, balance sheet, which we have

6  provided?

7  A    Yes.

8  Q    I have reviewed that and you have reviewed it.  Can we

9  agree that in looking at those CPA certified accounting

10 statements and financial statements, that that 30 percent free

11 cash flow does not exist?

12 A    We can agree that there are a lot of charges in there that

13 don't belong there that's causing the 30 percent to not exist.

14 Q    I just want you to answer -- does 30 percent free cash

15 flow exist in the financial statements that you have been

16 provided pursuant to our reporting obligation under the

17 agreement?

18 A    No.

19 Q    Thank you.

20 A    No.

21 Q    So it wouldn't have triggered the principal payment that

22 you discussed on direct?

23 A    Sir, I guess I'm a little unpracticed at this.  But it

24 seems to me I would want to answer your questions in full, and

25 you're asking me to just say yes or no, I guess.

```
 1   Q     You know --
 2   A     But I'm trying --
 3   Q     I understand.
 4   A     -- to give you the full picture of the situation.
 5         Would you restate the question again?
 6   Q     Well, I think my prior question to that, the question I
 7   just asked you --
 8   A     Right.
 9   Q     -- was that you had agreed that in looking at the
10   certified CPA financial statements that we provided to you
11   pursuant to our reporting requirements under the agreement,
12   that free -- 30 percent free cash flow did not exist, and you
13   said yes?
14   A     Correct.
15   Q     The follow-up question then was considering that
16   30 percent free cash flow does not exist, then the trigger to
17   pay you principal in addition to the interest does not exist,
18   as well?  Just --
19   A     I know you want me to give you a yes-no answer.
20         THE COURT:  I think it calls for a yes, a no, or an I
21   don't know.
22         THE WITNESS:  Okay.  Then, yes, I agree with your --
23   BY MR. PARKER:
24   Q     I'm not trying to be tricky.  I'm --
25   A     I'm not either.  I'm trying to answer.  I'm trying to give
```

```
 1  you a full answer, but sometimes I get confused about the
 2  yes-nos in the full answer.
 3          THE COURT:  Remember, Mr. Prince, Mr. English is going
 4  to make sure that you get to say what you want to say before
 5  this is over.  So just answer this man's questions and rely on
 6  your own attorney, all right?
 7          THE WITNESS:  Yes, sir.
 8  BY MR. PARKER:
 9  Q    You mentioned on direct the Regions Bank relationship,
10  correct?
11  A    Yes.
12  Q    And you mentioned their involvement in this transaction
13  that occurred in September 2017, correct?
14  A    Yes.
15  Q    The one thing that I didn't hear was I believe that you
16  had to sign a subordination agreement as it relates to this
17  transaction in September 2017; is that correct?
18  A    That's correct.
19  Q    And I believe the parties to that agreement -- and I will
20  put it in front of you here -- the parties to the agreement
21  were Kaya Associates, yourself, and Hui Huliau -- Kaya
22  Associates, yourself, and Regions Bank; right?
23  A    That's my understanding, yes.
24  Q    And I may not even -- you have seen it before, right?  I
25  think --
```

1  A     Yes.

2  Q     -- you have probably seen that.

3      I just had a couple of questions about timing of the

4  events in your conversations with Regions.

5      When did you first inform Regions that either you alleged

6  a default took place as it relates to the loan and amended

7  restated agreement, or that it was alleged due and payable?

8  Can you remember the first time?

9  A    It's probably -- I have a longstanding relationship with

10 Regions Bank, not just with Kaya, but with lots of other

11 things.  And it was probably -- I am going to guess it was

12 probably around December that I had my first conversation with

13 Regions about this.  And the conversation was about the fact

14 that I wanted to --

15             THE COURT:  Hold on.

16             THE WITNESS:  You're right.  Sorry.

17             THE COURT:  Listen carefully to what this gentleman is

18 asking you.  Make sure you're just answering his questions, all

19 right?

20             THE WITNESS:  Yes, sir.  Sorry.

21 BY MR. PARKER:

22 Q    So your first conversation with Regions Bank regarding the

23 alleged default and alleged due and payable status of this --

24 of the loan -- the subject of the amended and restated loan

25 agreement was December 2019 --

```
 1  A     2019.

 2  Q     2019.

 3  A     Yes.  I believe it was December or January.

 4  Q     December 2019 or January 2020?

 5  A     Correct.

 6  Q     Now, I believe you've marked as an exhibit -- and I'm not

 7  sure which one it is -- but I think it caused for your law firm

 8  Maynard Cooper to send a letter to Hui Huliau -- specifically

 9  Howard Russell -- that was dated August 15th?

10  A     Yes.

11  Q     It was 2019, right?

12  A     Yes.

13  Q     And I think in that letter you used the word alleged

14  default or alleged due and payable as a result of the July

15  interest payment that was late.  I think you testified to that,

16  as well.

17  A     Yes.

18  Q     Okay.  Was there -- what was the reason for you waiting

19  until December 2019 or January 2020 to talk to Regions?

20  A     My conversation with Regions had nothing to do with

21  telling them Hui Huliau was in default.  My conversation with

22  Regions essentially was for my own -- my own interest, which

23  was, hey, we've got this situation.  I may get Kaya back.  What

24  do I have to do to resume -- what accounts do we need to set up

25  for me to resume operations if and when I do?
```

1  Q     I'd like to mark as Defense Exhibit 2 the subordination

2  agreement that I think you signed --

3  A     Yes.

4  Q     -- back in 2016.  Can you take a look at that?

5  A     Yes.

6  Q     Can you tell me -- you remember signing that.  I think I

7  asked you that.

8  A     Yes.

9  Q     Can you give me your understanding of how that

10 subordination agreement is supposed to work, just -- I want to

11 understand what you --

12 A     Sure.  I mean, it's -- in my mind, it's real clear.

13 Regions gets paid before I do.

14 Q     Okay.  Can you take a look at page 9 of the agreement?

15 A     Yes.

16 Q     I believe that subparagraph B above the section 9

17 paragraph says that the subordinated creditor, which is you on

18 the agreement, shall promptly notify the bank of the occurrence

19 of any default under the subordinated debt; is that correct?

20 A     Yes.

21 Q     And the first notice that you gave to Regions was either

22 December of 2019 or January 2020?

23 A     Correct.

24 Q     Okay.  Is it also your understanding, Mr. Prince, that if

25 it wanted to, Regions could intervene in this very action

 1  because you have alleged that the loan, which is the subject

 2  matter of the amended loan and restated agreement, is either

 3  default, alleged default or alleged due and payable.  Is it

 4  your understanding that Regions has that right to do that?

 5  A    I'm sorry.  I didn't catch what -- they have a right to do

 6  exactly what?

 7  Q    To intervene and have their voice be heard in this

 8  litigation that you have filed.  Do you -- have you talked to

 9  them about that?

10  A    About this litigation, no.  No.  I mean, I've talked --

11  they understand what's going on.  I've been --

12  Q    Do they know litigation is going on?

13  A    Yes.

14  Q    Okay.

15  A    Yes.  I mean, I think it's clearly -- when I tell them

16  that I am looking to resume operations with Kaya, I think the

17  rest of it becomes evident.

18  Q    Okay.

19         MR. PARKER:  Your Honor, give me maybe a minute to

20  take a look and consult here.

21  BY MR. PARKER:

22  Q    I believe this has already been marked as an exhibit.

23  It's Plaintiff's Exhibit Number 5, I believe.  It is the

24  continuing guaranty.  Do you remember that exhibit, Mr. Prince?

25  A    Yes, I do.

1  Q    And I guess this is an exhibit in which Hui Huliau

2  guaranteed payment to John Prince for Tranche A in the amount

3  of $3,287,500?

4  A    Yes.

5  Q    So, in essence, in terms of what you wanted from a damage

6  standpoint from Tranche A, this would be consistent with what

7  you testified that you were seeking this amount of money --

8  $3,287,500 --

9  A    Yes.

10 Q    -- damages?

11           MR. PARKER:  Right now, no further questions.

12           MR. ENGLISH:  May I?

13           THE COURT:  (Nodded head.)

14                        REDIRECT EXAMINATION

15 BY MR. ENGLISH:

16 Q    Mr. Prince, Mr. Parker asked you an awful lot of questions

17 about your expectations.  Let me follow up on expectations.

18 A    Yes.

19 Q    Did you expect Kaya and Hui to honor the terms of your

20 deal?

21 A    Yes, I did.

22 Q    Did you expect that there would be no interparty loans

23 from Kaya to other Hui organizations?

24 A    Yes, I did.

25 Q    Did you expect 20 to $30,000 a month in management fees?

1  A    No, I did not.

2  Q    Did you expect personal expenses to be paid from Kaya's

3  accounts?

4  A    No, I did not.

5  Q    Do you think -- do you expect that if those things hadn't

6  happened there might have been some profit to pay you on a

7  quarterly basis?

8  A    I think in my mind it's very obvious.

9  Q    Mr. Parker was asking you about the guaranty that was

10 given to you by Hui as part of this transaction.

11 A    Yes.

12 Q    That's something in addition to the loan agreement,

13 correct?

14 A    Correct.

15 Q    There's also a pledge agreement, was there not?

16 A    Yes.

17 Q    And if you would, turn to the pledge agreement, which is

18 Exhibit 6.

19 A    Yes.

20 Q    Take a look on page 3 under exhibit or paragraph Section

21 7.

22 A    Yes.

23 Q    Do you see under Events of Default, exhibit or Section A,

24 there lists a number of remedies you can have in numbered

25 paragraphs?

```
 1  A    Yes.

 2  Q    Do you see the -- about halfway down it says in the line

 3  that starts with "shall then be disbursed"?  Are you there?

 4  See the little number 3?

 5  A    Yes.

 6  Q    Right before number 3 it says "and/or" does it not?

 7  A    Yes, it does.

 8  Q    Read the next sentence, please, sir.

 9  A    And/or transfer the collateral to creditor's name, or the

10  name of its nominee and/or exercise as to the collateral all

11  the rights, powers, and remedies of an owner thereof.

12  Q    All right.  And if you look back on Section 2 on page 2,

13  you'll see what is defined as the collateral.  And tell me if

14  that's the stock of Kaya.

15  A    Yes, it is.

16  Q    And if you own the stock of Kaya, pursuant to this pledge

17  agreement, could you make the decisions for Kaya?

18  A    Yes.

19  Q    Is that what you want to do?

20  A    Yes.

21  Q    Do you think Kaya would be in a better position to pay off

22  your loan if you were running it, as opposed to what you have

23  seen from Hui Huliau?

24  A    I believe that is the case.

25  Q    And do you believe that the transactions and activities
```

1  that you have discussed here today, as it relates to those

2  loans and management fees, are negatively impacting the value

3  of Kaya?

4  A    Yes.

5  Q    Do you believe that the loss of human capital and customer

6  relationships you described earlier are negatively impacting

7  Kaya's viability as a government contractor?

8  A    That's probably the biggest negative impact.

9  Q    Do you believe that if those things are allowed to

10 continue, that Kaya will have any viability if and when you

11 regain the stock?

12 A    No.

13 Q    Has Kaya defaulted under the loan agreement?

14 A    Yes.

15 Q    Has Hui defaulted in your judgment under the pledge

16 agreement?

17 A    Yes.

18 Q    Have they -- has Hui made any separate payments to you

19 since the letter you saw in August of 2015?

20 A    No, they have not --

21 Q    Do you want the stock back?

22 A    -- other than the standard interest payments.

23 Q    Do you want the stock back?

24 A    Yes, I do.  I would like to rebuild what we had.

25       MR. ENGLISH:  No further questions, Your Honor.

1           THE COURT:  Anything further from the defendant?

2                      RECROSS-EXAMINATION

3  BY MR. PARKER:

4  Q    Mr. Prince, is it your understanding, based on the stock

5  pledge, you get the money plus Kaya?

6  A    No, that's not my understanding.  I mean, my understanding

7  is I get the -- I get Kaya back, and any impact to its value

8  would be assessed, as well.

9           MR. PARKER:  No questions.

10           MR. ENGLISH:  Can I clear that question up?

11                   FURTHER REDIRECT EXAMINATION

12  BY MR. ENGLISH:

13  Q    I am going to ask you this question, and I'm going to stop

14  because I think we have beat this horse.

15      What is your understanding as to the impact of taking back

16  the Kaya stock on the debt that's owed to you?

17  A    Well, as it currently stands, there's considerable amount

18  of debt within Kaya.  I believe it's somewhere around 1 and a

19  half to $2,000,000 that they're indebted.  In addition to that,

20  there's no operating capital left.  So that's the situation as

21  it is today.

22  Q    So would you intend to give Hui credit against the debt

23  that's owed to you for the value of Kaya when you take it back

24  over?

25  A    Yes.  I mean, that would -- yes.

1              MR. PARKER:  No further questions.

2              THE COURT:  Have we got one more witness?

3              MR. ENGLISH:  Yes, Your Honor.

4              THE COURT:  Here's my view.  That 20-minute witness

5    lasted an hour and a half, so we are going to go eat lunch.

6              MR. ENGLISH:  Your Honor, I apologize for being so

7    off.

8              THE COURT:  That's all right.  I will see you at 1:00

9    o'clock.

10             MR. PARKER:  Just to let you know that we have two

11   witnesses, as well.

12             THE COURT:  Ah.  You didn't mention to that to me at

13   the beginning of the hearing.

14             MR. PARKER:  We weren't sure whether they were going

15   to be able to make it.  We understand that we will be able to

16   put them up to testify.

17             THE COURT:  How long will those witnesses be?

18             MR. PARKER:  Probably about the same.

19             THE COURT:  Well, now, had I known that, I would have

20   structured this hearing differently, and I would have -- I

21   would have been much more miserly about time than I have been,

22   because y'all are about to take what should have been a

23   one-hour hearing and make a day of it, and that is not going to

24   suit me.

25         So we're going to take an hour.  And I suggest the two of

1    you figure out what's important to get up here.  And let's make

2    good use of our time, all right?

3              MR. ENGLISH:  Absolutely, Your Honor.

4              THE COURT:  Because you are not the only thing I have

5    to do today.

6         All right.  See you after lunch.

7              (Recess.)

8              THE COURT:  All right.  Who is your next witness?

9              MR. ENGLISH:  We are going to call Steve Johnson, Your

10   Honor, but I think defendant may want to be heard on something.

11             THE COURT:  Okay.

12             MR. PARKER:  The defendants listened to the message

13   the Judge gave us before the lunch break.  We have a way to

14   maybe short-circuit this process.

15             THE COURT:  Okay.

16             MR. PARKER:  We believe if the Judge would be willing

17   and eager to entertain it, a short legal argument on

18   plaintiff's failure to meet their burden, in terms of

19   injunctive relief at this point in the proceedings.  We have

20   witnesses that are well ready to come and testify, but what we

21   see this becoming -- and we were going to offer proof that

22   Mr. Johnson is also under a confidentiality agreement.

23        We're going to offer proof that this is not about -- this

24   hearing -- in our opinion, this hearing is not about whether

25   John Prince ran his company better than Hui Huliau runs it now.

1    And these witnesses can go back and forth for the next several

2    hours and talk about who did it better and who managed it

3    better.

4         I think the hearing is about whether he's met his burden

5    of irreparable harm, and I don't think he has.  And I think if

6    we could entertain that, we might be able to short-circuit this

7    proceeding.

8              THE COURT:  Hey, I'm open to that, if that's what the

9    lawyers would like to do.

10             MR. ENGLISH:  Your Honor, I think it's sort of a

11   couple of things.  You don't win the game at halftime.  I think

12   we have made substantial progress towards our burden of proof.

13   And now what they want to do is say you can't call your next

14   witness because you haven't met your burden of proof.  That's

15   not how it works.

16        The fact that they don't want you to hear from

17   Mr. Johnson, who was the president of Kaya until a couple of

18   weeks ago, tells you all that you need to know.  Mr. Johnson I

19   would expect to testify to the way Hui Huliau and its

20   affiliates have looted this company.  They want to make it

21   about money.  But remember there's been a default, both in

22   terms of payments and in terms of the covenant defaults, as it

23   relates to the loans of third parties.

24        Mr. Prince is entitled to get the stock back.  We saw that

25   in the pledge agreement.  Now.  He's entitled to it now.  And

1   they haven't given it to him.

2        And so it's not about whether he ran it better or not.

3   It's whether they're running it into the ground, whether this

4   company is going to survive if the Court doesn't require them

5   to do -- all we have asked them to do, which is don't do

6   anything outside the ordinary course.

7        What I expect Mr. Johnson is going to say is the day they

8   closed the transaction they took a $200,000 brokerage fee,

9   which is prohibited by the agreement.  Mr. Johnson is going to

10  testify to the loans, the $1.7 million in intercompany loans

11  that are prohibited by the agreement.  He is going to testify

12  to the $30,000 a month in payments to 4P, which go directly to

13  the bottom line and prevent Mr. Prince from getting payments.

14  He is going to testify to the personal credit card expenses

15  that are run through Kaya for the benefit of these 4P people.

16  So we are going to paint a picture with Mr. Johnson of the

17  looting that has gone on.

18       Mr. Johnson is under subpoena.  We served him with a

19  subpoena at lunch.  Maybe he has a nondisclosure agreement,

20  which I think Your Honor could still require him and should

21  require to him to testify.  But I think some of the things

22  Mr. Johnson's testimony may go to, as it relates to these cost

23  reimbursable, flexibly priced government contracts, where you

24  pass through a portion of your cost, some of this goes to the

25  calculation of these indirect rates, and whether Kaya is

```
 1   operated by Hui may be defrauding the government, or has the
 2   potential for doing that.
 3       And at a minimum, you know, for them to stand up and say
 4   there's a nondisclosure agreement, when federal law says
 5   there's no such thing in these circumstances, I think tells
 6   Your Honor all you need to know about the tactic to keep
 7   Mr. Johnson from the witness stand.  So we would like an
 8   opportunity to call him.
 9           MR. PARKER:  May I respond?
10       Under North Jackson, no injury is irreparable only if it
11   cannot be undone by monetary damages.
12       Very clear on direct testimony, we put a box, in terms of
13   this is an adequate remedy at law, and what he expected, and
14   what he would get if Tranche A and Tranche B played its course
15   September 2020, as prescribed by the amended restated loan
16   agreement.
17       The only extraordinary relief we have here is we have a
18   former founder, classic founders dilemma.  I can't let go.
19       He's a note holder.  Think about it.  He's a note holder.
20   All I heard this morning was we, we, we.
21       Kaya is the property of Hui Huliau.  Just because he
22   doesn't like the way it's being run doesn't allow him to come
23   in court and get this extraordinary type of relief.  He is
24   perfectly compensatable with what we talked about today on
25   direct.
```

1    He can -- and even if Kaya, you know, diminishes in value,

2    whatever it is, he's got a guaranty, a guaranty from Hui Huliau

3    to make him whole.  That's what's at issue today.

4    You know, I'm sorry that, you know, Mr. Prince, you know,

5    sold his company.  And I'm sorry that maybe that wasn't the

6    best for his whole enterprises that he thought it was going to

7    be back in 2017.  It was going to develop in 2018.  But we're

8    allowed to run our company the way we want to run it, you know.

9    We applied to the state of Alabama and got a license -- a

10   corporate license -- and have a social license to be able to

11   run the company the way we want to.  Just because he doesn't

12   like it, it seems unfair that he can come in.

13   I don't think he has met his prima facie burden.  So we

14   can spend the next two hours.  And I'm telling you it's going

15   to be two hours.  We are going to spend the next two, three,

16   four hours going back and forth.

17   They're going to put Steve Johnson up.  And then I am

18   going to call folks.  And we are going to go tit for tat on

19   every alleged business practice that they claim we did wrong or

20   bad.  That's where we are going.  So I think it deserves to be

21   heard.

22       MR. ENGLISH:  Can I say something just briefly?  This

23   idea they're entitled to run their company is fundamentally

24   wrong.  They have defaulted.  Your Honor has seen the pledge

25   agreement.

1          One of the cumulative remedies Mr. Prince is entitled to

2   is to take the stock back and act as if he is the owner.

3   That's what he wants to do.  That's what this case is about.

4          We have not asked Your Honor to order that today, because

5   all we want to do is have a chance to fully vet the issues in

6   discovery and come back to Your Honor with a more fully

7   developed record.  He is entitled to own the stock today.

8          It's not -- they want to make it all about money because

9   they think that's an easy out for them.  It's about preserving

10  that collateral.  If they are in default, we're not even trying

11  to, you know, unseat them.  We just want you to put some

12  constraints on them so they don't sell the Charleston facility

13  and default on these government contracts.  They don't continue

14  to fire people that are critical for the performance of the

15  company.  So there's some collateral there for Mr. Prince to

16  default on.

17         This idea he can be paid in September, they ought to pay

18  him now because they're in default now.  But if they're not

19  going to, then we have to preserve that collateral.

20             THE COURT:  That would be what I have not heard.  I

21  have not heard from the defense why he's not in default.

22             MR. PARKER:  Well, I think at this stage it's

23  allegations, right?  At this stage, we haven't even answered

24  the complaint.

25             THE COURT:  Sir, I'm asking you to answer the

 1  question.  You have not addressed the issue of default, so I'm

 2  asking you:  Do you deny that Hui Huliau is in default?

 3          MR. PARKER:  We can provide testimony that would

 4  suggest the exchanges between Howard Russell and John Prince

 5  would give anybody in dealing with Mr. Prince the apparent, you

 6  know, thought pattern that things were fine.

 7      The first several discussions that took --

 8          THE COURT:  So, again, though, so do you say they're

 9  not in default?  Or do you say they are?

10          MR. PARKER:  We do not believe we are.  I don't

11  believe the plaintiffs have proved that allegation yet.

12          THE COURT:  All right.  Well, I hear your argument.

13          MR. PARKER:  Now, I'd also say --

14          THE COURT:  Hold on, sir.

15          MR. PARKER:  I'm sorry.

16          THE COURT:  So I hear your argument --

17          MR. PARKER:  Okay.

18          THE COURT:  -- that he has a right to money damages,

19  and I get that.  But he also has a right to protect his

20  collateral, does he not, if the collateral may evaporate?

21      I would -- I don't understand why he would have no

22  interest in making sure that that collateral was still there,

23  that these stock certificates that are pledged would not have

24  diminishing value.

25          MR. PARKER:  First of all, he is already protected in

1  that.  It's not about the collateral.  It is about his monetary

2  damages when it comes around to September 2020.  And he's

3  protected by the guaranty that Hui signed.  So the

4  collateral --

5          THE COURT:  He's protected by the guaranty as long as

6  Hui is viable.  But if that's all he needs to be a hundred

7  percent safe, then why does he need collateralization of the

8  stock certificates?  Tell me what I am missing here.

9          MR. PARKER:  I don't think I'm explaining it as best I

10  can, but he's adequately compensated at law with monetary

11  damages, okay?  And the relief that he is trying to secure is

12  equitable relief only because he is alleging a default or a due

13  and payable event.

14          THE COURT:  All right.  Well, it sounds like we just

15  need to have this hearing.  And so I'd just say you need to

16  call your next witness.  Is there an objection as to calling

17  this witness?

18          MR. ENGLISH:  No, sir.

19          MR. PARKER:  Yes, there is.  First of all, I would

20  like to object that he is under an NDA with Kaya and restricted

21  from providing proprietary information, confidential

22  information.

23          THE COURT:  And is that nondisclosure agreement --

24  does that have an effect on what U.S. district courts order

25  people to do?

1          MR. PARKER:  Well, now that he has been subpoenaed --

2     he wasn't subpoenaed earlier this morning.  So I think that --

3     if we could have some type of protections in the record placed

4     on any information he would testify to.

5          THE COURT:  I will say this:  You know, this case

6     looks a lot straightforward to me.  I know you probably feel

7     like I'm beating up on a you little bit right now.  But I think

8     the issues seem to be -- at least the facts can be agreed on,

9     on some things.

10        I'm not so sure why you couldn't take ten minutes and have

11    an agreement that would get us on down the line.  We can have a

12    hearing and I can decide it.  But, you know, it's like I used

13    to tell folks in domestic relations court:  You are going to be

14    a lot more satisfied with the agreement that you reach than the

15    one that I mete out for you.

16        So would it be worth y'all talking?  If it's not, that's

17    okay.  That's what I get paid to do.  We'll have a hearing.

18         MR. PARKER:  Well, I think Mr. English had said a

19    couple of minutes ago is that all they want to do is think

20    about operating Kaya in the normal course of business.  So

21    maybe there is some agreement that can be reached.  So I think

22    that is a good use of everybody's time, and certainly an

23    efficient use of your time.

24         THE COURT:  Let's take ten minutes.  And I appreciate

25    it.

1           (Recess.)

2           THE COURT:  All right.  We got something worked out?

3    Excellent.  Excellent.  Who's going to put it on the record?

4           MR. PARKER:  If he will read --

5           MR. ENGLISH:  I am going to read it, and Mr. Parker

6    will let the Court know if I blow it.

7           THE COURT:  That's fine.  And will one of you do a

8    hard order for me based upon what we put on the record?

9           MR. ENGLISH:  Absolutely.

10          THE COURT:  Great.

11          MR. ENGLISH:  We will be happy to do it and submit it

12   for your approval.

13          THE COURT:  Excellent.  Excellent.

14          MR. ENGLISH:  We ready?

15          THE COURT:  Ready.

16          MR. ENGLISH:  Your Honor, to resolve the pending

17   motion for T.R.O. and preliminary injunction, the parties have

18   agreed to a -- well, I guess what I think we have agreed to

19   call a consent injunction.  There are several elements, and I

20   will read them slowly hopefully correctly.

21       And all this generally relates to Kaya.  So I am going to

22   try to work that in here.

23       That Kaya will not -- first element:  Kaya will not pay

24   management or back office charges except to the extent they are

25   allowable.  And then there is a $10,000 maximum per month on

1    the management fee.

2        There will be no Kaya intercompany or third-party loans

3    without John Prince's consent.

4        That as relates to Kaya, there will be no personnel

5    changes other than for cause without Prince's consent, which

6    shall not be unreasonably withheld.

7        The defendants would notify Prince in confidence two

8    business days prior to any personnel changes or actions.  If

9    there is no objection from Prince received within those two

10   business days, then the action or change can proceed.  If

11   Mr. Prince lodges an objection within two business days, the

12   parties will work together to try and resolve it.  And if they

13   can't, then they can ask the Court to give us some guidance on

14   that point.  But the action or change would not take effect

15   until, if there's an objection, the parties either resolve it

16   amicably or if the Court orders, one way or the other.

17       The defendants will deliver the stock certificate of Kaya

18   required by the pledged agreement within one week of today.

19          MR. PARKER:  Just one note.  Could we get two weeks?

20   Because Wilson Elser, I think, is the law firm that has it.

21   And we've got to push them to get it --

22          MR. ENGLISH:  Make that two weeks.

23       Kaya will not pay the personal expenses of anyone.

24       No profit distributions unless 30 percent of free cash

25   flow is paid to Prince.

 1      No Kaya transactions outside the ordinary course without

 2  Prince's approval, which will not be unreasonably withheld.

 3      And then we've also agreed that the terms of this consent

 4  injunction do not affect the parties' rights under the amended

 5  and stated loan agreement and the other related documents.

 6          THE COURT:  Anything else?

 7          MR. PARKER:  No.  That's it.

 8          THE COURT:  All right.  And who is necessary on your

 9  side to consent to that?

10          MR. PARKER:  In terms of counsel, or --

11          THE COURT:  The agreement -- yes.  In terms of --

12          MR. PARKER:  I can consent to it.

13          THE COURT:  Just for the record, state who you have

14  consent on behalf of to enter into that agreement.

15          MR. PARKER:  I have consent on behalf of the corporate

16  defendant Hui Huliau.  And I have consent on behalf of both

17  individual defendants, Deryl Wright and Howard Russell.

18          THE COURT:  And I assume your client is sitting here

19  in the courtroom.

20          MR. ENGLISH:  Yes, Your Honor.  Mr. Prince is here,

21  and I have the authority to consent on his behalf.

22          THE COURT:  Mr. Prince, you have heard the agreement.

23  That's also your agreement, as well?

24          MR. PRINCE:  Yes, sir, it is.

25          THE COURT:  Then the Court will order the parties to

1  immediately begin abiding by this agreement until such time as

2  you have a written order for me.

3       Thank you very much.   I appreciate your diligent efforts

4  very much.   Safe travels.

5            (Whereupon, the above proceedings were concluded at

6       3:49 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

<u>CERTIFICATE</u>

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.




*Christina K Decker*                              05-21-2020

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255