FILED

2020 Jun-02  PM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| JOHN PRINCE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 5:20-cv-00208-LCB |
| | ) |
| HUI HULIAU, DERYL WRIGHT, and | ) |
| HOWARD RUSSELL, | ) |
| | ) |
| Defendants. | ) |

### DECLARATION OF DERYL WRIGHT

I, Deryl Wright, hereby state and declare as follows:

1. My name is Deryl Wright. I am the Chief Executive Officer of Hui Huliau. I understand my declaration will be used in support of Hui Huliau's brief in opposition to plaintiff John Prince's motion for partial summary judgment.

2. KAYA Associates, Inc. is a wholly-owned subsidiary of Hui Huliau. Hui Huliau purchased all of KAYA's stock in a transaction dated September 6, 2017. Part of the transaction included executing a loan agreement in favor of Mr. Prince. Mr. Prince was the former founder and owner of KAYA. At the time Hui Huliau purchased KAYA, KAYA owed Mr. Prince a debt, which Hui Huliau assumed during the purchase of KAYA.

3. Mr. Prince had also signed a subordination agreement with Regions Bank. Regions Bank held a promissory note from KAYA and Mr. Prince agreed to,

among other things, subordinate his rights in receiving payments from KAYA to Regions Bank. Attached as Tab 1 is a true and correct copy of the subordination agreement between Mr. Prince and KAYA. The subordination agreement was provided to Hui Huliau by Regions Bank after this lawsuit was initiated.

4.      At the closing of the transaction, Hui Huliau paid $200,000 to 4P Management, Inc., a management company wholly owned by Hui Huliau, for services rendered in support of the transaction and supporting Hui Huliau in transitioning day-to-day control of KAYA. While these funds were paid out of a line of credit held by KAYA, the funds were paid to 4P Management on behalf of Hui Huliau. 4P Management is not a broker, finder, or investment banker that would be prohibited from receiving a fee under the transaction agreement.

5.      In July 2018, KAYA made a principal payment to Mr. Prince in addition to its interest payment under the loan agreement. In August 2019, KAYA made a payment to Mr. Prince under the loan agreement. Mr. Prince initially objected to the late payment and stated he would return it in seven days. However, Mr. Prince did not return it to KAYA or continue to object to its receipt, instead keeping that payment and all subsequent payments made by KAYA. Until the lawsuit was filed, Mr. Prince received and accepted all payments that he was entitled to receive under the loan agreement. After Mr. Prince initiated this lawsuit, Regions

2

Bank informed KAYA that it could not make any additional payments to Mr. Prince as a result of the subordination agreement.

6.     Hui Huliau's former general counsel was Brendan Prince, Mr. Prince's son. Brendan Prince was KAYA's former general counsel and was hired by Hui Huliau after it purchased KAYA. Hui Huliau has initiated an investigation into communications between Brendan Prince and Mr. Prince related to the internal operations of KAYA. Based on the preliminary findings of the investigation, it appears that, soon after the purchase of KAYA by Hui Huliau, Brendan Prince began providing Mr. Prince inside information that was not authorized by Hui Huliau and was in direct conflict to his role as general counsel of Hui Huliau. Based on these communications, it is my belief that Mr. Prince was well-informed about the financial condition and day-to-day operations of KAYA.

7.     Additionally, it is my suspicion that Mr. Prince used the inside information he received from his son to direct decisions related to KAYA through his son and KAYA's former President, Steven Johnson. Mr. Johnson was originally hired by Mr. Prince as President of KAYA and he remained in that position until he resigned two weeks prior to Mr. Prince initiating this lawsuit. Mr. Johnson appeared at the February 24th hearing prepared to testify for Mr. Prince and has since submitted a declaration in support of Mr. Prince's efforts to take KAYA's stock. However, the

extent of Mr. Prince's actions and the impact of those actions has not yet been determined. Hui Huliau is continuing its investigation into these issues.

8.     With regard to KAYA's financials, the third party receivable entries reflect fees paid by KAYA for back office support services performed by other Hui Huliau companies, including 4P Management and Hui Huliau Services. For example, Hui Huliau can provide superior insurance coverage for lower costs by combining all of its employees into larger group health insurance plans. If each company had to secure group health insurance for only its employees, the rates, premiums, and coverage would not be as beneficial as what Hui Huliau can provide. Because Hui Huliau pays the insurance premiums directly for KAYA employees, it is necessary for KAYA to reimburse Hui Huliau for the premiums. Any payments for insurance premiums and other necessary support are documented on KAYA's financial records as "third party receivables." There is nothing improper about this accounting practice.

9.     To date, Hui Huliau has operated—and will continue to operate—KAYA in a manner consistent with practices standard to its industry and in compliance with all government regulations applicable to Native Hawaiian Organizations.

10.     I declare under the penalty of perjury that the foregoing is true and correct.

4

This the 18th day of May, 2020.

By: _____
Deryl Wright

# Tab 1

# SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT (the "Agreement"), dated May 11, 2016, made by **John H. Prince**, (the "Subordinated Creditor") and KAYA Associates, Inc., an Alabama corporation (the "Borrower"), in favor of Regions Bank, an Alabama banking corporation (the "Bank").

## W I T N E S S E T H:

WHEREAS, the Borrower and the Bank have entered into a Line of Credit Agreement dated May 11, 2016 (the "Credit Agreement") pursuant to which the Bank has agreed to extend to the Borrower a revolving line of credit (the "Line of Credit") not to exceed Five Million and No/100 Dollars ($5,000,000.00) in principal amount at any one time outstanding, as evidenced by a Revolving Line of Credit Note dated May 11, 2016 (the "Note") in the face amount of Five Million and No/100 Dollars ($5,000,000.00) executed and delivered by the Borrower to the Bank; and

WHEREAS, the Borrower is indebted to the Subordinated Creditor in the principal amount of Six Million Three Hundred Eighty-Nine Thousand Two Hundred One and 25/100 Dollars ($6,389,201.25) evidenced by a Promissory Note dated April 29, 2016 and may hereafter from time to time become indebted or otherwise obligated to the Subordinated Creditor in further amounts. All indebtedness and other obligations of the Borrower to the Subordinated Creditor now existing or hereafter owed as a result of said promissory note (whether created directly or acquired by assignment or otherwise), and interest and premiums, if any, thereon and other amounts payable in respect thereof or in connection therewith, are hereinafter referred to as the "Subordinated Debt"; and

WHEREAS, it is a condition precedent to the making of the loans as evidenced by the Note, as hereinafter defined, by the Bank under the Loan Documents, as hereinafter defined, that

the Subordinated Creditor shall have executed and delivered this Agreement; and

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to make said loans as evidenced by the Senior Note, the Subordinated Creditor and the Borrower each hereby agrees as follows:

SECTION 1.  Definitions.

Liabilities shall mean (a) all amounts of principal becoming due and payable under the Senior Note in accordance with the terms thereof, whether on demand, at stated maturity, or an installment, by declaration of acceleration or otherwise; (b) all amounts of interest becoming due and payable under the Note in accordance with the terms thereof, including interest on any overdue principal and (to the extent permitted by applicable law) on any overdue interest; (c) all other amounts payable by the Borrower with respect to the Loan Documents; and (d) all renewals, extensions and modifications of any and all of the obligations referred to in (a) through (c) above, whether or not any renewal, extension or modification agreement is executed in connection therewith.

Loan Documents shall mean the Note, the Credit Agreement, this Agreement, the Guaranty Agreement dated May 11, 2016 executed by KAYA Associates, Inc. in favor of Bank, and all other documents now or hereafter executed and delivered in connection with any of the foregoing documents or to evidence or secure the Note or other Loan Documents, and all amendments thereto.

Security Agreement shall mean that certain Security Agreement dated May 11, 2016 executed by Borrower in favor or Bank.

SECTION 2.  Agreement to Subordinate.  The Subordinated Creditor and the Borrower

each agrees that the Subordinated Debt is and shall be subordinate, to the extent and in the manner hereinafter set forth, to the prior payment in full of the Liabilities, whether for principal, interest (including, without limitation, interest, as provided in the Note, accruing after the filing of a petition initiating any proceeding referred to in Section 3(a), whether or not such interest accrues after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding). For the purposes of this Agreement, the Liabilities shall not be deemed to have been paid in full until the Termination Date (as defined in the Note) shall have elapsed and unless the Bank shall have received payment of the Liabilities in full in cash.

SECTION 3. <u>Events of Subordination</u>. (a) In the event of any dissolution, winding up, liquidation, arrangement, reorganization, adjustment, protection, relief or composition of the Borrower or its debts, whether voluntary or involuntary, in any bankruptcy, insolvency, arrangement, reorganization, receivership, relief or other similar case or proceeding under any Federal or State bankruptcy or similar law or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Borrower or otherwise, the Bank shall be entitled to receive payment in full of the Liabilities before the Subordinated Creditor is entitled to receive any payment of all or any of the Subordinated Debt, and any payment or distribution of any kind (whether in cash, property or securities) that otherwise would be payable or deliverable upon or with respect to the Subordinated Debt in any such case, proceeding, assignment, marshalling or otherwise (including any payment that may be payable by reason of any other indebtedness of the Borrower being subordinated to payment of the Subordinated Debt) shall be paid or delivered directly to the Bank for application (in the case of cash) to, or as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the

Liabilities until the Liabilities shall have been paid in full.

(b)  In the event that (i) any event of default described in any of the Loan Documents shall have occurred and be continuing or (ii) any judicial proceeding shall be pending with respect to any such event of default, then no payment (including any payment that may be payable by reason of any other indebtedness of the Borrower being subordinated to payment of the Subordinated Debt) shall be made by or on behalf of the Borrower for or on account of any Subordinated Debt, and the Subordinated Creditor shall not take or receive from the Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, payment of all or any of the Subordinated Debt.

(c)  In the event that any event of default under any of the Loan Documents or event which with the giving of notice or the lapse of time, or both, would become an event of default shall have occurred and be continuing and the Bank gives written notice thereof to the Subordinated Creditor, then no payment (including any payment that may be payable by reason of any other indebtedness of the Borrower being subordinated to payment of the Subordinated Debt) shall be made by or on behalf of the Borrower for or on account of any Subordinated Debt, and the Subordinated Creditor shall not take or receive from the Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, payment of all or any of the Subordinated Debt, unless and until the Liabilities shall have been paid in full, during a period (the "Payment Blockage Period") commencing on the date of receipt of such notice and ending on the earlier of (i) the date such event of default or event shall have been cured or waived in writing and (ii) the date 365 days from the date of receipt of such notice.  Any number of such notices may be given by the Bank.

(d)  In the event that any Subordinated Debt is declared due and payable before its stated maturity, the Bank shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Liabilities before the Subordinated Creditor is entitled to receive any payment (including any payment which may be payable by reason of the payment of any other indebtedness of the Borrower being subordinated to the payment of the Subordinated Debt) by the Borrower on account of the Subordinated Debt.

SECTION 4.   <u>In Furtherance of Subordination</u>.   The Subordinated Creditor agrees as follows:

(a)  If any proceeding referred to in Section 3(a) above is commenced by or against the Borrower,

(i)  the Bank is hereby irrevocably authorized and empowered (in its own name or in the name of the Subordinated Creditor or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution referred to in Section 3(a) and give acquittance therefor and to file claims and proofs of claim and take such other action (including, without limitation, voting the Subordinated Debt or enforcing any security interest or other lien securing payment of the Subordinated Debt) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Bank hereunder; and

(ii)  the Subordinated Creditor shall duly and promptly take such action as the Bank may request (A) to collect the Subordinated Debt for the account of the Bank and to file appropriate claims or proofs or claim in respect of the Subordinated Debt, (B) to execute and deliver to the Bank such powers of attorney, assignments, or other instruments as the

5

Bank may request in order to enable the Bank to enforce any and all claims with respect to, and any security interests and other liens securing payment of, the Subordinated Debt, and (C) to collect and receive any and all payments or distributions which may be payable or deliverable upon or with respect to the Subordinated Debt.

(b)  All payments or distributions upon or with respect to the Subordinated Debt which are received by the Subordinated Creditor contrary to the provisions of this Agreement shall be received in trust for the benefit of the Bank, shall be segregated from other funds and property held by the Subordinated Creditor and shall be forthwith paid over to the Bank in the same form as so received (with any necessary indorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the Liabilities in accordance with the terms of the Loan Documents.

(c)  The Bank is hereby authorized to demand specific performance of this Agreement, whether or not the Borrower shall have complied with any of the provisions hereof applicable to it, at any time when the Subordinated Creditor shall have failed to comply with any of the provisions of this Agreement applicable to it.  The Subordinated Creditor hereby irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

SECTION 5.  No Commencement of Any Proceeding.  The Subordinated Creditor agrees that, so long as the Liabilities shall not have been paid in full in cash, the Subordinated Creditor will not take, sue for, ask or demand from the Borrower payment of all or any of the Subordinated Debt (other than the payment, prior to an event of default under the Loan Documents and so long as following such payment the Borrower shall not be in default under the

6

Loan Documents, of principal and interest on the dates set forth in schedule "A" attached hereto), or commence, or join with any creditor other than the Bank in commencing, directly or indirectly, or cause the Borrower to commence, or assist the Borrower in commencing, any proceeding referred to in Section 3(a).

SECTION 6.   Rights of Subrogation.   The Subordinated Creditor agrees that no payment or distribution to the Bank pursuant to the provisions of this Agreement shall entitle the Subordinated Creditor to exercise any right of subrogation in respect thereof until the Liabilities shall have been paid in full.

SECTION 7.   Subordination Legend:   Further Assurances.   The Subordinated Creditor and the Borrower will cause each instrument evidencing Subordinated Debt to be endorsed with the following legend:

"The indebtedness evidenced by this instrument is subordinated to the prior payment in full of the Liabilities (as defined in the Subordinated Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Subordination Agreement dated May 11, 2016 by the maker hereof and payee named herein in favor of Regions Bank."

The Subordinated Creditor and the Borrower each will further mark its books of account in such a manner as shall be effective to give proper notice of the effect of this Agreement and will, in the case of any Subordinated Debt which is not evidenced by any instrument, upon the Bank's request cause such Subordinated Debt to be evidenced by an appropriate instrument or instruments endorsed with the above legend.  The Subordinated Creditor and the Borrower each will, at its expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or

7

desirable, or that the Bank may request, in order to protect any right or interest granted or purported to be granted hereby or to enable the Bank to exercise and enforce its rights and remedies hereunder.

SECTION 8.   Agreements in Respect of Subordinated Debt.   (a) The Subordinated Creditor will not:

(i)  Cancel or otherwise discharge any of the Subordinated Debt (except upon payment in full thereof paid to the Bank as contemplated by Section 4(b)), convert or exchange any of the Subordinated Debt into or for any other indebtedness or equity interest or subordinate any of the Subordinated Debt to any indebtedness of the Borrower other than the Liabilities;

(ii)  Sell, assign, pledge, encumber or otherwise dispose of any of the Subordinated Debt unless such sale, assignment, pledge, encumbrance or disposition is made expressly subject to this Agreement; or

(iii)  Permit the terms of any of the Subordinated Debt to be changed in such a manner as to have an adverse effect upon the rights or interests of the Bank hereunder; or

(iv)  Permit the prepayment of the Subordinated Debt, without the prior written consent of the Bank.  If the Subordinated Debt is prepaid without the Banks' consent, the amount of prepayment received by the Subordinated Creditor shall be received in trust for the benefit of the Bank shall be segregated from other funds and property held by the Subordinated Creditor and shall be paid over to the Bank in the same form as so received (with any necessary indorsement) to be applied (in the case of cash) to or held as

collateral (in the case of non-cash, property or securities) for, the payment or prepayment of the Liabilities in accordance with the terms of the Loan Documents.

(b)  The Subordinated Creditor shall promptly notify the Bank of the occurrence of any default under the Subordinated Debt.

SECTION 9.  <u>Agreement by the Borrower</u>.  The Borrower agrees that it will not make any payment of any of the Subordinated Debt, or take any other action, in contravention of the provisions of this Agreement.

SECTION 10. <u>Obligations Hereunder Not Affected</u>.  All rights and interests of the Bank hereunder, and all agreements and obligations of the Subordinated Creditor and the Borrower under this Agreement, shall remain in full force and effect irrespective of:

(i)  any lack of validity or enforceability of any of the Loan Documents or any other agreement or instrument relating thereto;

(ii)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities, or any other amendment or waiver of or any consent to any departure from the Loan Documents, including, without limitation, any increase in the Liabilities resulting from the extension of additional credit to the Borrower or any of its subsidiaries or otherwise (provided the Subordinated Debt is only subordinated to the Liabilities to the sum of the amount of Liabilities as currently contemplated by the Loan Documents plus future borrowings of $1,000,000);

(iii)  any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for

9

all or any of the Liabilities;

(iv)   any manner of application of collateral, or proceeds thereof, to all or any of the Liabilities, or any manner of sale or other disposition of any collateral for all or any of the Liabilities or any other assets of the Borrower or any of its subsidiaries;

(v)   any change, restructuring or termination of the corporate structure or existence of the Borrower or any of its subsidiaries; or

(vi)   any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower or a subordinated creditor.  This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Liabilities is rescinded or must otherwise be returned by the Bank upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

SECTION 11. Waiver.  The Subordinated Creditor and the Borrower each hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Liabilities and this Agreement and any requirement that the Bank protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Borrower or any other person or entity or any collateral.

SECTION 12. Representations and Warranties.   The Subordinated Creditor and the Borrower each hereby represent and warrant as follows:

(a) The Subordinated Creditor is the legal and beneficial owner of the Subordinated Debt now outstanding free and clear of any lien, security interest, option or other charge or encumbrance.

(b)   There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(c)   The Subordinated Creditor has, independently and without reliance upon the Bank and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

SECTION 13. Amendments, Etc.   No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Subordinated Creditor or the Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 14. Expenses.   The Borrower agrees upon demand to pay to the Bank the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts or agents, which the Bank may incur in connection with the (i) the administration of this Agreement, (ii) the exercise or enforcement of any of the rights of the Bank hereunder or (iii) the failure by the Subordinated Creditor or the Borrower to perform or observe any of the provisions hereof.

SECTION 15. <u>Addresses for Notices</u>.  All notices and other communications provided for hereunder shall be in writing (including telecopier, telegraphic, telex or cable communication) and mailed, telecopied, telegraphed, telexed, cabled or delivered to it, if to the Subordinated Creditor, at 431 Pine Dale Dr, Guntersville, AL 35976, Attention: John H. Prince; and if to the Borrower or the Bank, at its address specified in the Credit Agreement, or as to each party, at such other address as shall be designated by such party in a written notice to each other party.  All such notices and other communications shall, when mailed, telecopied, telegraphed, telexed or cabled, be effective when deposited in the mails, telecopied, delivered to the telegraph company, confirmed by telex answerback or delivered to the cable company, respectively.

SECTION 16. <u>No Waiver:  Remedies</u>.  No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 17. <u>Continuing Agreement; Assignments Under the Credit Agreement</u>.  This Agreement is a continuing agreement and shall (i) remain in full force and effect until the payment in full of the Liabilities, (ii) be binding upon the Subordinated Creditor, the Borrower and their respective successors and assigns, and (iii) inure to the benefit of, and be enforceable by, the Bank and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (iii), the Bank may assign or otherwise transfer all or any portion of its rights and obligations under the Loan Documents to any other person or entity, and such other person or entity shall thereupon become vested with all the rights in respect thereof granted to the Bank

12

herein or otherwise.

SECTION 18. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama.

IN WITNESS WHEREOF, the Subordinated Creditor and the Borrower each has caused this Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

KAYA Associates, Inc., an Alabama corporation

By: _____
Larry Stephens
Title:   President

**John H. Prince**

By: _____
John H. Prince

ACCEPTED:

Regions BANK, an
Alabama banking corporation

By: _____
Title: _____



13

271151417101X

STATE OF ALABAMA          )
                                                        :
COUNTY OF _____ )

     I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that _____ whose name as _____ of KAYA Associates, an Alabama corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

     Given under my hand and official seal of office this _____ day of May 2016.


                                         _____
                                         Notary Public

(SEAL)                           My Commission Expires:_____



STATE OF ALABAMA          )
                                                        :
COUNTY OF _Madison_ )

_Amanda Black_ ↳ I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that ~~John H. Prince~~, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, (s)he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

     Given under my hand and official seal of office this _15th_ day of May 2016.


                                       _Kelly A. Close_
                                       Notary Public
                                       My Commission Expires: _04/28/2020_

KELLY A. CLOSE
NOTARY
My Comm. Expires
Apr. 28, 2020
PUBLIC
ALABAMA STATE AT LARGE

STATE OF ALABAMA          )

                          :

COUNTY OF Madison )

     I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that John Prince, Larry Stephens whose names as _clients_ of Regions Bank, an Alabama corporation, is signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

     Given under my hand and official seal of office this _15_ day of May 2016.

<br>

Sandra Norwood

Notary Public

(SEAL)     My Commission Expires: _1-14-19_

SANDRA NORWOOD
My Commission Expires
January 14, 2019

15